## ELI TUCKER *vs.* STATE OF MARYLAND, Use of BENJAMIN F. JOHNSON et al.

*Death by Wrongful Act—Intentional Violence—Burden of Proof on Defendant to Show Justification—Contributory Negligence— Opinion of Witness.*

In an action to recover damages for a death caused by the wrongful act of the defendant, the burden of proof is in the first place on the plaintiff to show that the defendant's act was *prima facie* wrongful, and then the burden is cast on the defendant to establish any justification or excuse for such act.

The doctrine of contributory negligence has no application to a case where defendant's act causing the injury was founded on intentional violence.

Defendant shot and killed a man who was beating defendant's servant with a club. In an action by the widow and children of the deceased to recover damages, under Code, Art. 67, giving a right of action for a death caused by the wrongful act, neglect or default of a party, the plaintiff's evidence was to the effect that the beating of the servant had ceased before defendant fired the shot, and that his act was altogether wrongful. The defendant offered evidence to

show that he had reasonable ground to believe that his servant would be killed or severely injured unless he interfered, and that he fired for the purpose of frightening the deceased and causing him to refrain. *Held*, that the defence set up distinct, affirmative matters by way of avoidance, and that the jury were properly instructed that the burden was upon the defendant to satisfy them by preponderating proof of any justification or legal excuse for the shooting.

In such action a witness who saw the affray cannot be asked whether the beating of the servant by the deceased produced in witness the impression that the servant's life was in danger, because that would be but the statement of an opinion.

Appeal from the Court of Common Pleas (HARLAN, C. J.) At the trial some of the prayers offered were the following :

*Plaintiff's Prayer No. 1 1-2.*—If the jury find that Uriah Johnson, the deceased, was related to the equitable plaintiffs as charged in the declaration, and that on the 1st April, 1893, said Johnson and Andrew Reynolds were engaged in a fight near the defendant's store at Bynum Station, in Harford County, and that the defendant came out of his store and seeing said fight, ran up to within a short distance of said Johnson and fired his pistol toward him, and shot and killed him, then their verdict must be for the plaintiffs, unless they are satisfied by preponderating proof that said shooting was done for the purpose of preventing said Johnson from killing said Reynolds or inflicting upon him great bodily harm, and that the facts at the time of the shooting were such as to warrant the reasonable belief in his mind, in the honest exercise of his judgment, that there was no other reasonably possible—or at least probable—means of preventing said injury, and that his act was one of necessity. (*Granted.*)

*Defendant's 1st Prayer.*—Even if the jury find from the evidence that the defendant killed Uriah Johnson, the father and husband of the equitable plaintiffs, by shooting him with a pistol, their verdict must be for the defendant, if they further find that at the time of the firing of the shot by the defendant which resulted in the death of said Johnson—

(1.) One Andrew Reynolds was a clerk of defendants.

(2.) That the said Johnson was then beating the said Reynolds over the head with a club.

(3.) That the defendant then and there *bona fide* believed that the said Reynolds would be then and there killed, or suffer grievous bodily harm by said beating, and that the only way to prevent said Reynolds from being then and there killed or being then and there grievously harmed, was to shoot the said Johnson.

(4.) That the facts, as they appeared to said defendant at the time of the shooting, furnished him with reasonable grounds for his belief, and—

(5.) That the shooting took place by reason of said belief on the part of the defendant, and to prevent said Reynolds from then and there being killed or grievously harmed. (*Granted.*)

*Defendant's 2nd Prayer.*—If the jury find from the evidence that the defendant killed Uriah Johnson, the father and husband of the equitable plaintiffs, by shooting him with a pistol, and also find that at the time of the firing of the shot by the defendant which resulted in the death of said Johnson—

(1.) That one Andrew Reynolds was a clerk of the defendant.

(2.) That the said Johnson was then beating said Reynolds over the head with a club.

(3.) That the defendant then and there *bona fide* believed that said Reynolds would be then and there killed, or suffer grievous bodily harm by said beating, and that the only way to prevent said Reynolds from being then and there killed, or being then and there grievously harmed, was to shoot said Johnson, and

(4.) That the shooting took place by reason of said belief on the part of the defendant, and to prevent said Reynolds from then and there being killed or grievously harmed.

Then, even though they further find that said belief was

not justified by the facts of the case as found by the jury, but was in excitement hastily and negligently adopted by the defendant, still their verdict must be for the defendant, if they further find that said Uriah Johnson, by his own negligence or wrongful acts, contributed directly to the injury causing his own death.  (*Refused.*)

*Defendant's 3rd Prayer.*—If the jury find from the evidence that the said Uriah Johnson came to his death by reason of a pistol-shot fired by the defendant, and also find that at the time of the firing of the shot by the defendant, which resulted in the death of said Johnson—

(1.) One Andrew Reynolds was a clerk of the defendant's.

(2.) That the said Johnson was then beating said Reynolds over the head with a club.

(3.) That the defendant fired his pistol without any intention of shooting said Johnson, but for the purpose of frightening him, and causing him to stop beating Reynolds.

(4.) That either by the unskillfulness or negligence of the defendant in firing the pistol, or because of his arm being seized at the time of the firing of the shot, the said Johnson was shot and killed.

Then their verdict must be for the defendant, provided they further find that the said Uriah Johnson, by his own negligence or wrongful acts, contributed directly to the accident causing his death.  (*Refused.*)

The jury returned a verdict for plaintiffs for $5,000.

The cause was argued before McSHERRY, C. J., FOWLER, BOYD, PEARCE and SCHMUCKER, JJ.

*Edgar H. Gans* and *William H. Harlan* (with whom was *B. H. Haman* on the brief), for the appellant.

*Thos. R. Clendinen* and *J. J. Archer* (with whom was *Ed. H. Webster* on the brief), for the appellees.

BOYD, J., delivered the opinion of the Court.

This suit was brought under Article 67 of the Code against the appellant to recover damages for the killing of

Uriah Johnson, who was the husband of Ann E. Johnson, and the father of the other equitable plaintiffs. Since the passage of the statute which now constitutes that Article of the Code, actions for alleged negligence causing death have been very frequent, but this is the first time this Court has been called upon to review a case in which the death, which is the foundation of the suit, was occasioned by the discharge of a loaded pistol at the person killed. Our statute is very similar to what is known as *"Lord Campbell's Act"* (9 and 10 Victoria, ch. 93), in most respects, but it provides that the suit is to be brought in the name of the State, for the benefit of the wife, husband, parent and child of the deceased, " whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued), have entitled the party injured to maintain an action and recover damages in respect thereof" against the person who would have been liable if death had not ensued, " although the death shall have been caused under such circumstances as amount in law to felony."

The appellant had a store at Bynum Station, on the Baltimore and Lehigh R. R., in Harford County, in which was the office of the railroad agent. Andrew Reynolds, the brother-in-law and clerk of the appellant, was the acting agent of the company. Uriah Johnson was engaged in the canning business, and several carloads of empty tin cans, intended for him, had been at the station some days. Reynolds had demanded demurrage on the cars, and had refused to let Johnson unload them until it was paid. Tucker, at the request of Reynolds, talked to Johnson about it. On March 31, 1893, the disagreement about the demurrage resulted in Johnson and Reynolds coming to blows, but after the fight was over Johnson went away and returned with the money, which he paid. On the first day of April Johnson and a colored man were unloading a car, and, according to the evidence of the defendant, Johnson attacked Reynolds as he was passing by and beat him severely over

the head with a club. Some one called Tucker, who was in the store, and he went out, having a pistol in his possession. There is some discrepancy between the witnesses as to the details of what then occurred, but Tucker fired his pistol twice at, or at least towards Johnson—one ball striking in the side of the car three or four feet above the ground, and the other striking Johnson, and resulting in his death a few days afterwards. The evidence of the plaintiff's witnesses was to the effect that Johnson and Reynolds had been separated before Tucker fired, but the defendant and some of his witnesses said that Johnson was still striking Reynolds over the head with the club, the size of which was also in dispute. The defendant testified as follows: "I ran out and saw Uriah Johnson beating Reynolds over the head; * * * he was hitting him as hard as he could, and not saying a word; the blood was running down over Andrew, and I thought he would kill him on the spot; I drew my pistol and fired, as I thought, above his head; the second shot I fired, Eugene, my son, caught my arm."

1. After Tucker, Reynolds and some others had testified on behalf of the defendant, his son was called, and after stating that he saw Johnson clubbing Reynolds over the head, he was asked the following question: " When you saw this beating of Reynolds by Johnson, what impression did it make on you as to the effect which the beating was producing on Reynolds, especially as to whether Reynolds' life was endangered by the beating?" The Court, on objection, refused to allow it to be answered. The theory of the appellant is that he was justified in shooting Johnson, either to prevent a felony from being committed by him, or in the defence of the life of Reynolds, his clerk, provided he *bona fide* believed, and had reasonable ground for such belief, that Reynolds' life was in danger. He therefore contends that this inquiry was relevant and proper as reflecting upon that question. It is true that under the common law a homicide may ordinarily be excused in defence of a servant under such circumstances as would ex-

cuse the killing in self-defence, but without stopping here
to discuss what would justify the latter, can such evidence
as that offered be admitted? It is sometimes difficult to
draw the line between what is and is not admissible from a
non-expert, when his opinion is offered in evidence, but
when the facts on which he bases his opinion can be specifi-
cally described, so that the jury can form a proper judg-
ment, it is certainly safer to confine the witness to a state-
ment of the facts and let the jury draw the conclusions.
Indeed, in many cases, where the evidence is spoken of, as
opinions of witnesses, it is really their knowledge that they
testify to. Sometimes a witness cannot communicate to
the jury all the facts and circumstances that influence his
judgment, but in a case such as this there is no reason why
the witness cannot describe to the jury what he saw—what
actually took place within his view. If he is to be per-
mitted to state the impression made upon his mind from
what he saw, that would likely depend in a great measure
upon his own temperament. A cool, collected man, when
seeing a fight, would be impressed in a wholly different
manner from what a timid or excitable person would be.
The sight of blood on such an occasion might impress a
nervous person with the idea that the injured one was in
imminent danger of the loss of his life, while one more ac-
customed to such scenes might regard it as rather a trivial
matter. Then, again, each witness might form his conclu-
sions from an imperfect view of the situation. Those who
have had any experience in criminal courts know how
widely witnesses differ in their accounts of fights they see—
and oftentimes honestly differ, but they have viewed the
scene from different standpoints or have been influenced by
the amount of excitement the occurrence has produced in
them. It is true it may be, and oftentimes is, difficult for
the jury to reconcile the statement of facts, but it would
be much more so for them to reach proper conclusions, if
they must consider the impressions made on the minds of
the spectators. In *Turnpike Road* v. *Leonhardt*, 66 Md.

70, this character of testimony was considered, and it was there said : " There are, however, cases where all the facts cannot be detailed to the jury, which are necessary for a proper understanding of the subject.  *  *  *  But where the facts can be adequately exhibited to the jury it ought to be done without admitting the evidence of opinion." Without citing other authorities we think it would be a dangerous practice to permit such questions as the one proposed and are of the opinion that it is not such as are authorized.

2. The next point for consideration is raised by the plaintiffs' prayers marked one and a-half and twelve. They practically raise the same question, and as the twelfth is the shorter of the two we will quote from it. By it the Court said, if the jury found that the defendant " fired his pistol towards Uriah Johnson, the father and husband of the equitable plaintiffs, and shot and killed him, then the burden is upon the defendant to satisfy the jury by preponderating proof of any justification or legal excuse for said shooting." A good deal of the argument was addressed to the form of the pleadings. Undoubtedly in many cases the pleadings may be some guide as to where the burden of proof lies, but it does not always follow, as the defendant is sometimes permitted to offer evidence under the general issue to prove a defence, the burden of which is on him to establish. In the case before us the amended declaration does not allege that the defendant *wrongfully* discharged the pistol at Johnson, but apparently purposely left out that word, as the declaration originally filed did charge that the defendant " wrongfully shot and wounded " him. The defendant only filed the general issue plea, which, strictly speaking, only put in issue the question whether the defendant shot and killed Johnson, if we are governed by the pleadings alone. We do not refer to the other allegations in the *narr.* of beating, striking with stones, etc., as they are not embraced in these prayers, and the evidence shows conclusively that the death of Johnson was the result of the shoot-

ing, and not from the other alleged injuries.    It might well
be questioned whether the declaration, if it had been de-
murred to, would have been sufficient, but neither that
question nor any other which requires us to pass on the
pleadings, has been presented by the record.    Nor do we
think that any special light on the point raised by these
prayers, is reflected by the suggestion that the statute has
created a new cause of action, which is undoubtedly true,
for although in some States statutes have been passed which
only provide for a survival of the cause of action the de-
ceased had, our statute is not of that character.    By it
" the jury may give such damages as they may think pro-
portioned to the injury *resulting from such death*," and not
such as the injured person could have recovered if he had
survived.    The injury for which the equitable plaintiffs are
compensated is the pecuniary loss sustained by reason of
the death of the person through the wrongful act, neglect
or default of the defendant.    The statute, therefore, prop-
erly speaking, was not passed, as is sometimes said of it,
to remove the operation of the common law maxim, *actio
personalis moritur cum persona*, as it has not undertaken to
keep alive an action which would otherwise die with the
person, but, on the contrary, has created a new cause of ac-
tion for something for which the deceased person never
had, and never could have had, the right to sue—that is to
say, the injury resulting from his death.    But notwithstand-
ing all that, the *wrongful act, neglect or default*, is of the
same character as that for which the injured party could
have sued, if he had survived the injury, and therefore the
question of burden of proof is in no wise affected by the
fact that the statute gives a new cause of action.

It must be conceded that to entitle the plaintiffs to re-
cover, the burden was on them, primarily, to establish such
facts as would bring them within the terms of the statute,
and they were therefore required to make out a *prima facie*
case of *wrongful killing*, but from that concession it does
not follow that the burden was on them throughout, as to

all questions that might be raised by way of defence. It
has been held over and over again in this State, that if a
suit is brought under this statute for the negligence of the
defendant, the burden is on the plaintiff to prove the negli-
gence, yet if the plaintiff's testimony makes out a *prima*
*facie* case of negligence, and does not disclose want of care
on the part of the deceased, the burden is on defend-
ant to establish contributory negligence, if that is relied on.
*Frech's case*, 39 Md. 574; *Hauer's case*, 60. Md. 462;
*Steever's case*, 70 Md. 75, and many others that might be
cited. So, although, by the terms of the statute the plain-
tiff in such cases can only recover by proving that the
death of the person was caused by the negligence or de-
fault of the defendant, the defendant has the burden cast
on him to prove that the proximate cause of the injury was
the negligence of the deceased, and that, too, notwithstand-
ing the plaintiff is required to prove, as a part of his case,
that the negligence of the deceased did not directly con-
tribute to the injury. It is true that the latter may be sat-
isfied by the presumption of due care, and the known and
ordinary disposition of men to guard themselves against
danger, when the plaintiff's testimony as to the accident
does not show affirmatively that the deceased did directly
contribute to the injury, but as the plaintiff has made out
a *prima facie* case, and the defendant seeks to excuse him-
self from the effect of his negligence by showing that the
deceased directly contributed to the injury, he is in the
position of practically confessing and avoiding the plaintiff's
case, and therefore has the burden on him. When, then,
we come to consider the other ground of recovery allowed
by the statute—the wrongful act of the defendant—if the
plaintiff makes out a *prima facie* case, and the defendant
admits the killing, but undertakes to justify or excuse his
act, why should not the burden be on him to show justifi-
cation or legal excuse ? There can be no doubt about the
fact that these plaintiffs did make out a *prima facie* case of
the *wrongful* shooting of Johnson by the defendant. If it

be conceded that the mere fact that one man shoots and kills another without any evidence of the circumstances under which it is done, does not necessarily place the burden upon the former to prove justification, or legal excuse, can there be any doubt about it, under such circumstances as are in this case? The evidence offered on behalf of the plaintiffs was to the effect that the shooting was wrongful and without the slightest justification or excuse, and according to that, even the clubbing of Reynolds by Johnson, relied on by the defence, had ceased before Tucker fired his pistol. If the case had been submitted then, there was no evidence, so far as appears in the record, which would have justified the Court in submitting to the jury any question of justification or excuse, as there was none legally sufficient to sustain such a theory. The defendant and several of his witnesses testified that Johnson was still beating Reynolds when he fired, and we have already given his statement of what was occurring at that time. He also said that he shot to frighten Johnson and keep him from beating Reynolds, and that he had no intention of shooting him. He admits that after the shooting he and several others were striking at Johnson, and that he thought he ought to be punished. After Reynolds had gone on the store porch, and Johnson had started away with his wagon and horses, he ran after him and threw stones at him— some of the witnesses said he knocked Johnson off the horse with a stone. This was after Johnson was shot, and although defendant says he did not know then that he had shot him, his conduct and some expressions used by him show very clearly how he felt towards him. Whether he fired towards Johnson merely to frighten him or with the intention of shooting him, there certainly was not the slightest justification for it, unless the beating of Reynolds was a sufficient excuse. When he shot there were a number of persons present, most of whom were apparently the friends of defendant and Reynolds. No one suggested that Johnson was armed with anything but the club. The day

before the shooting Tucker was present when Johnson and Reynolds had a fight, and Reynolds knocked him down twice with his fist—Johnson knocking him down once with a stone. There was a very little to base the defence of justification on, and it would doubtless have been difficult to satisfy the jury that it was necessary to resort to such dangerous means of stopping the fight or protecting Reynolds, when it might probably have been done by more peaceful means. But, however that may be, it is not pretended that the defendant was justified in shooting unless he *bona fide* believed that Reynolds would be killed, or suffer grievous bodily harm, that the only way to prevent such consequences was to fire his pistol, and that he had reasonable grounds for his belief. The pertinent question, therefore, to be determined, is whether the burden was on the defendant to establish these facts. Although there is considerable conflict on the subject, the weight of authority, and what seems to us to be the most reasonable and the safest rule for the good of society, is that even in criminal cases, when the State has made out a case which shows the defendant's guilt beyond a reasonable doubt, and the prisoner sets up an affirmative defence, such as self-defence, as an excuse for the act, the burden is on him to establish it by preponderating evidence. In *Com.* v. *York*, 9 Metc. 93, CHIEF JUSTICE SHAW delivered an able and comprehensive opinion on the subject, in which many authorities are collected. See also *Wharton's Criminal Evidence*, section 331; *State* v. *Schweitzer*, 57 Conn. 532; *State* v. *Barringer*, 114 N. Car. 840; *Com* v. *Choate*, 105 Mass. 451; *People* v. *McCarthy*, 110 N. Y. 316; *Brown* v. *State*, 83 Ala. 33; *Smith* v. *State*, 86 Ala. 28; *Mitchell* v. *State*, 22 Ga. 211. Under these authorities, and many others that might be cited, in a criminal prosecution the burden would clearly have been on Tucker to prove justification under such evidence as there is in this case.

The doctrine that permits one man to kill another to save a third party should be applied with great caution, and at

least the *apparent necessity* for such act must clearly appear. There is in reality more necessity for holding the defendant to a strict account in such cases than when one claims to have killed another in his own defence. It may be that the person intended to be protected was the one actually at fault in bringing on the combat, and many other circumstances may enter into the question, such as the ability of the party to defend himself, or of the bystanders to avoid any serious injury being done, etc. When the defendant has used a deadly weapon, such as a pistol, resulting in the death of one who is not assailing him, there is every reason for the welfare of the peace of society, and for the safety of human life, that *he* be called upon to justify the use of such vigorous means. Any other application of this doctrine may furnish a screen for revenge, or a mere desire to punish one for striking or fighting a friend.

In civil cases the plaintiff is not bound to prove his case beyond a reasonable doubt, but only by preponderating testimony, and therefore it frequently happens that the burden will be cast upon the defendant in them when it would not in criminal cases. When the defence in civil cases amounts to a confession and avoidance, the burden is almost universally on the defendant. It may be true that generally such a defence is made under a plea of that character, but if the form of action permits such defence to be made under the general issue, or if the evidence is admitted under that without objection, it does not change *the effect* of the evidence. If Johnson had survived his injuries and had sued the defendant, undoubtedly the burden would have been on the latter to show justification, and we can see no valid reason why there should be any distinction in this respect between a suit brought by the party, if he survives, and one brought by those authorized to sue under the statute if the injuries result in his death. In both instances the plaintiff must prove a *prima facie* wrongful act.

We find very few authorities on the question of the burden of proof in cases of this character. *Nichols* v. *Win-*

*frey*, 79 Missouri, 545, is the principal one relied on by the defendant.    In that case the decision was largely based on the form of the pleadings, but it is easily distinguishable from this when we see from the opinion " that the facts on which the defendant could base his claim of self-defence were mainly disclosed by the plaintiff in developing her own case.    They were so inseparably interwoven in the circumstances and incidents of the homicide as not only to constitute part of the *res gestae*, but were included within the plaintiff's proofs descriptive of the offence itself."    As we have seen, there was absolutely nothing in the plaintiff's testimony to show any justification, and  the defence set up by the defendant himself was a new, affirmative fact—that he did not intend to shoot Johnson, and shot to frighten him because he believed Reynolds was in danger, etc.    In *Tiffany's Death by Wrongful Act*, section 64, it is said that "the law of self-defence is the same as in a criminal prosecution for homicide, except that the burden does not rest upon the plaintiff of proving the case beyond a reasonable doubt. The plea of self-defence does not cause the burden to shift." He cites *Nichols* v. *Winfrey* as authority for the statement, and it will be noticed that apparently he regards the burden in  criminal cases to  be  on  the  prosecution throughout, which we have already said we do not think correct.    In *March* v. *Walker*, 48 Texas, 377, it was said, "In this, as in every other case, it devolves on the plaintiff to establish his case, viz., that the killing was wrongful.    If the evidence fails to show a wrongful killing, but, whilst establishing the act of killing, developed that it was done in a justifiable exercise of the right of self-defence, it is scarcely necessary to say that the instruction was wrong."    With that we find no fault, as it is practically what we have already said, but *where the burden is*, under such facts as we have before us, is another question.    In *Brooks* v. *Harlan*, 65 Cal. 421, it was held that the burden was on the defendant to show that the shooting was done in self-defence, although there the answer was treated as equivalent to a plea in confession

and avoidance.   In *Darling* v. *Williams*, 35 Ohio St. 58, which was an action for death caused by shooting, the Court said that the case was to be tried in the same manner and governed by the same principles of law as if the party had not died from his injuries and was suing for damages.   These are all the authorities for suits brought for deaths caused by the intentional acts of the defendants, to which we have been referred, as at all reflecting upon this question, and we have not been aided much by them in reaching a conclusion, as this case presents different *controlling facts.*   If the plaintiff's testimony had presented any facts from which justification or legal excuse for the shooting was shown, or could properly be inferred, then the case would have been different, but it did not, and the defendant sought to excuse himself by trying to convince the jury that he believed Reynolds was in imminent danger, that the only way to protect him was to shoot at, or towards, Johnson, and that he had good grounds for that belief and acted on it.   It was not merely a question as to whether Johnson was still beating Reynolds, when defendant fired, which, as we have seen, was the real difference between the witnesses, but the defence depended mainly upon the belief of the defendant, his object in shooting and the necessity for it.   He thus set up distinct, affirmative matters of defence, which, under all the rules of evidence applicable to civil cases, he was required to establish by preponderating evidence, to meet the case proved by the plaintiffs, of the wrongful killing of Johnson.   We might have referred more particularly to the presumption which the law raises when deadly weapons are used, and to other matters, but this part of the opinion is already longer than desirable.

We have not discussed the form of the twelfth prayer, but only the principle involved in it.   If it stood alone, it might possibly be said that it was liable to mislead the jury, but, when taken in connection with the other prayers which were granted and the conceded facts, we do not think it was liable to that objection.   We fully recognize, as we have en-

deavored to show, the general principle that the burden was on the plaintiffs in this, as in other civil cases, to first establish their case by proper proof, but, that having been done the burden was then on the defendant to prove the justification or excuse which he set up as his defence.    We are therefore of the opinion that the ruling on this question by the Court below was right, and there was no error in granting either of these prayers.

3. The next alleged error complained of was rejecting the second and third prayers of the defendant, which raised the question of contributory negligence.    The authorities seem to agree that the doctrine of contributory negligence can have no application when the action is founded on intentional violence.    *Kain* v. *Larkin*, 56 Hun. 79;    *Gray* v. *McDonald*, 104 Mo. 313;    *Louisville, etc., R. R. Co.* v. *Mackie*, 103 Ala. 160;    *Darling* v. *Williams*, 35 Ohio St. 63;    *Steinmetz* v. *Kelley*, 72 Ind. 442.    But the appellant contends that, conceding that to be so, there was some evidence tending to show that the injury happened through his negligence, and therefore instructions on contributory negligence were relevant.    If that be admitted, these prayers were properly rejected for several reasons.    In the first place there is no evidence that Johnson was guilty of any *negligence*.    The whole theory of the appellant's defence was that he was making an unlawful assault on Reynolds, and we confess we do not understand how it can be said that he was *negligent*.    There is certainly no evidence to show that any act of his was the *proximate* cause of his death, but that was directly caused by the act of the defendant, and the question is whether that was excusable.    The instruction asked for in the second prayer was simply another way of saying to the jury that the defendant was justified in shooting, if he believed it necessary for Reynolds' protection, and shot by reason of that belief, although the jury found that such belief was not justified by the facts in the case, if they believed that Johnson was beating Reynolds. For in point of fact Johnson did nothing that could be

claimed to be either negligence or a wrongful act, except
beat Reynolds.    That prayer is not only contrary to law,
but to the theory on which the case was tried on both sides.
The third prayer is to the effect that, if the jury found that
defendant fired his pistol to frighten Johnson, without intend-
ing to shoot him, and that he killed him, either by his un-
skilfullness or negligence, or because his arm was seized at
the time, then the verdict must be for the defendant, if the
jury further found that Johnson, by his own negligence, or
wrongful act, contributed to the accident.    There being, as
we have seen, no evidence of negligence or wrongful act by
Johnson, unless it be his beating Reynolds, this prayer is
equivalent to saying that if the jury believed that Johnson
was killed by the defendant through the latter's negligence,
or because his arm was seized at the time he fired the pistol,
the plaintiff could not recover, if they believed that Johnson
was then beating Reynolds.

To sustain the theory of either of these prayers would
prevent recovery against any one who claimed to kill an-
other in defence of his servant or member of his family,
although the evidence utterly failed to excuse the defendant's
act.    For if the fact that the deceased party was attacking
the servant or member of the family is evidence of such
negligence or wrongful act as to be said to directly con-
tribute to the injury causing his death and thereby prevent
recovery, that would be the end of such cases.    To justify
the killing, the facts we have already stated must be shown,
but these prayers, if granted, would in such cases obviate
the necessity of showing just what the law says is necessary
to be proven to excuse the defendant.    So, without discuss-
ing or referring to other reasons, we think they were prop-
erly rejected.

We do not understand that the appellant presses the
exception to the rulings on the prayers in regard to dam-
ages.    Those granted seem to cover the question, and to
have properly instructed the jury as to the correct meas-

ure of damages.   *Hauer's case*, 60 Md. 449; *Mahone's case*, 63 Md. 135.   The judgment will be affirmed.

> *Judgment affirmed, costs to be paid*
> *by the appellant.*

(Decided June 22nd, 1899).

McSHERRY, C. J., dissented, and delivered the following opinion :

I agree with every proposition, save one, announced in the very lucid and carefully prepared opinion written by JUDGE BOYD ; and the proposition from which I am constrained to dissent is that which relates to the burden of proof. It is presented by the instructions numbered one-and-a-half and twelve.   The twelfth instruction lays down this doctrine, namely : If the jury find that the defendant "fired his pistol towards Uriah Johnson   *   *   *   *   *   and shot and killed him, then the burden is upon the defendant to satisfy the jury by preponderating proof of any justification or legal excuse for said shooting."   Thus, in explicit terms and unequivocally, the burden of proving the *character* of the act of killing is at the outset of the case put on the defendant to *exculpate* himself ; whilst, as I read the statute and understand the rules of evidence, that specific burden is placed on the plaintiff to *inculpate* the defendant, or the latter cannot be made liable at all.

The question is not whether the plaintiff *has* furnished or complied with the burden of proof, but whether he is *required* to furnish it.   If he is, then the Court ought to have told the jury, as matter of law, that the burden was on the plaintiff.   It may be true, in point of fact, that the burden was gratified by competent evidence ; but none the less, the defendant was entitled to have the jury rightly instructed on the law as to *where* the burden rested.   What *quantum* of evidence meets the burden, is one thing ; where the burden rests, is quite another thing.   One—the preponderance of fact—is for the jury ; the other—a rule of law—is for the Court to determine.   If wrongly determined it is reversible error.

This is a new cause of action, unknown to the common law. 8 *Am. & Eng. Ency.* (2nd ed.), 858, citing *Seward* v. *Vera Cruty*, L. R., 10 App. 59. It is the creation of a statute, *Code Pub. Gen. Laws*, Art. 67, sec. 1; and the conditions which must exist to warrant a recovery upon it are those, and those only, which the statute prescribes. It arises when negligence, or when a wrongful act has produced death. But, be the act relied on negligent or wrongful, it must be alleged, and more than that, it must be established by evidence. Whatever the kind of evidence required may be, it must be supplied by the party on whom the affirmative rests. In all cases of negligence, except when otherwise provided by statute, and even in the rare instances where the doctrine of *res ipsa loquitur* applies, more than the fact of an injury must be shown. Negligence, either active or passive, must be established and established as the efficient cause. Negligence, if the asserted ground of recovery, is never assumed as the cause of the injury; nor is it inferred from the mere fact of injury. *Balto. Elevator Co.* v. *Neal*, 65 Md. 456. It is as essential as an element in the case of the plaintiff as is the fact of injury; for an injury without negligence is not actionable on the ground of negligence, any more than negligence without injury would be. Proof, then, there must be of negligence when an action is brought under this statute to recover for a death caused by negligence; and that proof must be furnished by the plaintiff. Confessedly, the burden of proving that negligence is on the party who seeks to recover because of the negligence. But the twelfth instruction lays down precisely the converse of this rule as to the burden of proof, when the death has been caused, not by negligence, but by a wrongful act. Thus there are two rules of evidence, directly the opposite of each other; each relating to an action on the case, under the same statute, and the one or the other being applied, not as the form or the nature of the action may vary, but as the same injury may happen by one or the other of two different means; though

both means are coupled together, without distinction as to the mode of proof, in the statute constituting them new causes of action. Accordingly, without legislative direction, the mechanical *manner* in which the injury was inflicted is made the criterion to determine the rule of evidence as to the burden of proof. In the case of negligence, which is simply a breach of duty that is owed (and, therefore, in that sense is a wrongful act) the act of causal negligence must be proved; in the other instance, where an act strictly distinguishable from negligence, is the gravamen of the action, the naked, external act, without reference or regard to its surroundings or to the circumstances which define what it is, is held, of itself, to be such evidence of its wrongful character as to require the defendant to show that it was not, in reality, wrongful. Whilst the statute gives a right of action, provided the act causing the death is wrongful, this rule of evidence gives the right of action, *unless* the defendant shows that the act was rightful. You recover, not because you have shown the act to be wrongful, but because the defendant has failed to show that it was *not* wrongful. *Any* act, therefore, which causes death furnishes, if unjustified by the defendant, a valid cause of action, though the statute says only a *wrongful* act shall constitute a ground of recovery.

I fail to see any satisfactory reason for such a difference as to *where* the burden of proof should rest. Certainly, the Legislature has not made the difference. Had the Legislature, in giving this new cause of action, intended to cast upon the *defendant* the burden of proving that the act occasioning the death was *not* wrongful, instead of requiring the plaintiff to show that it *was* wrongful, it would have said so, as it did say in *Sec. 198, Art. 23, of the Code*, when dealing with a kindred subject. The section just alluded to provides that railroad companies shall be liable for injuring live stock on their tracks, unless the company shows that the injury was accidental. But no such rule of evidence has been prescribed with respect to the cause of

action now before us ; and the very fact that the rule of
evidence has been changed in the one and not in the other
instance is, of itself, sufficient to indicate that the General
Assembly did not intend to shift the burden of proof in a
case like this, but did intend to leave that burden on the
plaintiff.

The twelfth instruction puts out of view all question of *intent*
on the part of the defendant, segregates the act of killing from
all the attendant and surrounding circumstances, and lays
down the legal proposition that the *fact* of the killing—no
matter *why* the killing was done—is sufficient evidence,
until rebutted or explained by the defendant, to show that
when done it was wrongful.    I agree that in a criminal case
the *intent* to commit a homicide may be inferred from the
very fact of firing a bullet that causes the death of a per-
son ; *Allen* v. *The United States*, 164 U. S. 492 ; but it
seems to me obvious that the existence of the *intent* to kill
does not, in a civil proceeding, necessarily denote that the
killing was *wrongful.*    The intent to kill may justly, in a
criminal prosecution, be inferred from the means used in
killing, so as to exclude, for the good order and safety of
society, by a rebuttable presumption, an opposite hypothesis ;
but this principle in no way, as I apprehend, reflects upon
the question as to whether in such a case as this, the killing
was wrongful or right—for the question is, not whether
there was an intent to kill, but whether the plaintiff must
show that the homicide was wrongful.    A homicide may
be wrongful though not intended ; and it may not be wrong-
ful though intended.    For example : A person who negli-
gently, without design to injure any one, fires a shot into a
highway and accidentally kills another, is guilty of homi-
cide—the killing would be wrongful though not intended.
*Hochheimer, Law of Crimes, &c.*, sec. 18.    In defending
one's self against an atrocious crime it is lawful to take the
life of the assailant, and the *intention* to kill the aggressor
would not make the killing wrongful.    The presumption of
the intent to kill applied in a criminal case and arising from

the method of killing, cannot in a proceeding under this statute, supply proof of the *character* of the killing—that is, cannot indicate that the killing was wrongful—unless precisely the same presumptions with their consequences are alike available in both criminal and civil procedures. It is not *every* act causing death which gives under the statute, a right of action. It must be a *wrongful* act. The act, because it occasions death, cannot be said to be a wrongful act, unless *every* act that does occasion death, is, *per se*, wrongful. But every act causing death is not *per se* wrongful. Something more, then, than the naked, external fact of death and the means employed to produce it, must exist and must be shown before it can be said that the taking of life was, in a given civil case, wrongful. And as the right to recover depends, not on the bare act itself, but on the *character* of the act, that is, upon its being *wrongful*, it, of course, follows that the duty to show that the act *was* wrongful rests upon the party seeking a recovery on the specific ground that it was *wrongful*. The argument which concludes that the *fact* of killing demonstrates, in a civil case, the quality of the act of killing—that is marks, of itself, its wrongfulness—obviously fails to distinguish between rightful and wrongful killing, and consequently erroneously assumes that *all* killing is, in every form of proceeding, *prima facie* wrongful. However salutary that doctrine may be in criminal prosecutions, I see no reason for adopting it in such a case as this, particularly when, confessedly, if the cause of death had been an asserted negligent act, the *fact* of death would have been no evidence that the act which produced the death *was* negligent.

If you say that every taking of human life is unlawful unless justified or excused, I agree, certainly, as respects criminal proceedings; but I retort, as respects civil proceedings, three things: First, that what you say is nothing more than a statement that all unlawful taking of human life is wrongful; second, that the very statement you make concedes that there *may be* a taking of life which is not wrong-

ful; and third, that as your right of action depends, not upon the mere taking of life, but upon the *wrongful* taking of it, you must show the wrongfulness by excluding the justification. You do not show the wrongfulness by simply showing the fact without excluding the justification, because the concession that a justification would relieve the act of being wrongful, compels you, when you rely on the act as *being* wrongful to exclude that which would *prevent* it from being wrongful; otherwise you leave it in a position where it may or may not be wrongful. If it may or may not be wrongful, and therefore is perfectly neutral as you leave it to the jury by your instructions, how can you recover, when your right to recover depends, not upon an *uncertainty* as to the character of the act, but upon your proving that the act *was* wrongful?

I distinguish between the presumptions which, in the first instance, supply the place of proof in criminal procedure, and thus cast upon the accused the duty to explain; and presumptions permitted in a private civil action for damages. An indictment for murder includes a trespass with force and arms, where the State steps in to vindicate the outraged law. Punitive justice is applied to injurious actions proceeding from malignity of purpose, or from criminal recklessness implying such purpose, and not to physical actions merely. " The presumptions which belong to criminal cases are those natural and popular presumptions which are only observations turned into maxims, like adages and apophthegms, and are admitted in the place of proof, where better is wanting, but are always to be overturned by counter-proof." 2 *Burke's Works*, 623. Presumptions which appertain to civil cases are essentially of artificial contrivance. In dealing with questions of evidence in such cases, the Legislature may always ordain certain methods, by which alone it will suffer facts to be known and established; because their very essence, for the greater part, depends on the arbitrary conventions of men. Men "make fictions of law and presumptions of law, according to their

ideas of utility, and against those fictions and against presumptions so created, they do and may reject all evidence." 2 *Burke's Works*, 623; 3 *Mascardus, De Probationibus Con.*, MCCXXV. 111, as cited, *Wills Cir. Ev.*, 21. I might elaborate by illustrations these fundamental differences, but one will suffice. As all men, indeed, as the great majority of men, are not guilty of crime, it is a natural presumption that every man should be considered innocent until proved guilty beyond a reasonable doubt, not by a preponderance of evidence but to a moral certainty, but there is no such presumption, in fact, no presumption at all adopted in favor of a defendant in a civil action, and no such measure of proof required to fix a liability on him, since a mere preponderance of evidence is all that is needed. With as much propriety could this presumption of innocence, and this measure of proof, to a moral certainty, be imported from the criminal law into the law governing a civil procedure, as can the presumption of wrongful intent, arising from the use of a deadly weapon, be borrowed from the same source and be arbitrarily applied, by judicial adoption, in a suit under this particular statute. The two classes of cases—criminal and civil—are essentially different; the presumptions allowed in each have different origins; and the fallacy of the twelfth and the one-and-a-half instructions seems to me to lie both in the failure to recognize the dissimilarity of the grounds upon which presumptions are founded in these two classes of cases; and in the assumption that a presumption available in one, is *because* available there, necessarily available also in the other.

The vice of the twelfth and the one-and-a-half instructions is not cured, in my judgment, by any other instruction given by the trial Court. As I understand the opinion of the majority, it concedes that the twelfth instruction standing alone would be wrong, but it holds that the error is corrected by the other instructions. If thus corrected or cured it must be because the latter—the other instructions—present an opposite proposition, that is, a correct

proposition, on the burden of proof, the only subject with which the twelfth instruction deals. If the other instructions do *not* present an opposite proposition or do not relate to the burden of proof at all, then, obviously they do not cure the vice of the twelfth. If they *do* present an opposite proposition, and thus relate to the burden of proof, then there is an inconsistency and conflict between those instructions which are right, and the twelfth which is wrong; and this, of itself, would require a reversal. But the twelfth and the one-and-a-half are the only ones which relate to the burden of proof. The other instructions all deal with entirely different subjects. How, then, can these latter, when they have no reference to the burden of proof at all, cure a defective statement of law as to the burden of proof in the only instructions which do relate to the burden of proof? The silence of all the other instructions on that subject— and they are absolutely silent—does not remedy a palpable error on that precise subject in totally different instructions pertaining solely and exclusively to *that* subject. The correct instructions cannot cure the incorrect ones, when the latter have no relation to the former, and are wholly independent of them.

(Filed June 22nd, 1899).