This is an appeal from a judgment rendered against the appellant for the death of Maria L. Hall, the daughter of Amelia Hall and mother of Nacmi Hall, an infant, which resulted from a collision between an automobile in which she was riding and one of the cars of the appellant. There are seven bills of exception presenting rulings on the admissibility of evidence and one embracing the rulings on the prayers. Three prayers of the plaintiff were offered, all of which were granted, with some modifications of the second and third, and twelve were offered by the defendant, six of which were granted but the first, second, third, third and one-half, sixth and ninth were rejected. Some special exceptions to the plaintiff's prayers were overruled. To the granting of the plaintiff's prayers and to the rejection of the defendant's six prayers exceptions were taken.
As the rulings on the prayers present the important questions we will first consider them. Frank Kratzmeyer, who owned a Chalmers roadster, took E.J.T. Jockell, Miss Van Fossen and Miss Hall out riding on Sunday night, March 25th, 1917, and the collision occurred about 11.30 P.M. which resulted in injuries to Miss Hall, from which she died on April 5th. She lived with her mother, Mrs. Amelia Hall, and contributed to her support. Naomi Hall is her daughter, being twelve years of age in July, 1919, and the father of Naomi was said to be George Kelly, to whom the equitable plaintiffs claim Miss Hall was married, but that she was with him only one day and night, and she continued to use her maiden name. The four persons named above were on the front seat of the automobile. Kratzmeyer was driving, Miss *Page 107 
Van Fossen was sitting next to him, on his left, Miss Hall next to her, and Jockell was sitting partly on her lap and partly on the "beading" of the automobile, with his left foot out on the step, as he described it in the record. Scott Street runs north and south, and has two tracks on which the cars of the appellant run in going between Baltimore and Washington and Annapolis. Hamburg Street runs east and west. The automobile was going west on Hamburg Street, towards Scott Street, and the car of the appellant was coming from Washington on the northbound track, having left there at 10.05 P.M. There is an elevated viaduct some distance south of where the accident happened. The engineer of maintenance of way of the appellant testified that the bottom of the incline was 1,155 feet from the north building line of Hamburg Street, which street is 38.5 feet wide from curb to curb, and has sidewalks of 13.5 feet on each side. Kratzmeyer and Jockell were called as witnesses, but Miss Van Fossen was not.
Although there were conflicting statements made by the witnesses as to the speed of the electric car and of the automobile, as well as to whether any signals were given by the car as it approached Hamburg Street, it would be difficult for Kratzmeyer to avoid the effects of his contributory negligence if this was a suit by him. While the accident occurred in a part of the city which is closely built up, the evidence shows that it was Sunday night, in the neighborhood of half past eleven and the street was quiet, little or no traffic being then upon it. If the car was going at such a speed as some of the plaintiff's witnesses said it was, on an upgrade which was shown to be there, there could have been no possible reason for Kratzmeyer not hearing it coming, if the automobile was going at the speed he said it was, and he was using ordinary care and caution in approaching the tracks. He said he was going ten or twelve miles an hour, was running within three or four feet of the north curb on Hamburg Street and *Page 108 
that he could stop his car when going at that speed in a car length, which was about fourteen feet. He said there were some holes in Hamburg Street, which looked as if they had been putting in water or gas pipes and filled them up with cobblestones, thus leaving depressions, which were about seventy feet from Scott Street. This also appears in his evidence: "As I passed the holes I looked down Scott Street and there wasn't anything in sight when close to the building line, I looked again and there was nothing in sight, and when I looked around again this thing was right on top of me and I sheered to my right, going in the same direction he was going, and that quick (indicating) this happened, and that is all I knew until I woke up again. Q. As you approached Scott and Hamburg Streets before you reached the building line, did you look to either side? A. Yes, I looked before I approached Scott Street. My longest vision was that way (indicating), and I looked that way. Q. Which way is that? A. To my left, and that was the longest vision, and as I approached on my right that way (indicating) I looked and it was clear, and when I went to look to my left again that quick it was on me (indicating). Q. How far below Hamburg Street was the electric car when it came into your line of vision? A. I couldn't say. It came so quick I couldn't judge. I looked around again in my right of way, and he was right on top of me then. It all happened in a minute, and I couldn't judge how far it was or where he was at the time. Q. Try to give approximately how far below Hamburg Street he was when you first observed him? A. I couldn't say how far below. I judge he was almost across the street, according to that, as I had the right of way to cross the street, and as I looked around as soon as I turned my head there he was, so he must have been pretty near across the street at the time the way I dope it out. As soon as I saw him that quick (indicating) it was over with."
When that is taken in connection with other evidence, it would seem that Kratzmeyer was trying to cross ahead of *Page 109 
the car. Without definitely determining that, but assuming for the purposes of this case that he could not recover by reason of his contributory negligence, it still remains to determine how far, if at all, that affects the right of the equitable plaintiffs to recover on account of the death of Miss Hall. InUnited Rwys. Elec. Co. v. Crain, 123 Md. 332, JUDGE PATTISON, in speaking for the Court, repeated what had been previously held by this Court in P., B. W.R.R. Co. v.Hogeland, 66 Md. 149; B. O.R.R. Co. v. State, use ofStrunz, 79 Md. 335, and United Rwys. Co. v. Biedler,98 Md. 564, that "it may be stated as the general rule of the Courts of this country, with but few exceptions, that the contributory negligence of a carrier, or of the driver of a public or private vehicle, not owned or controlled by the passenger, and who is himself without fault, will not constitute a bar to the right of the passenger to recover for injuries received. The only principle upon which such contributory negligence could bar the right of recovery is, that the driver should be regarded as the agent or servant of the passenger," and JUDGE PATTISON added: "This is undoubtedly the established law of this State and we have no inclination to depart from it." In B. O.R.R. Co. v.State, use of McCabe, 133 Md. 219, after referring to the above, it is said, "it is well settled by the above cited cases and others that the negligence of the driver in such cases cannot be imputed to the passenger injured or killed, but it is equally well settled in all such cases that the right to recover for the injury or death of such party is defeated, when it is shown that he has contributed to the accident by his own negligence, and therefore when there is any evidence tending to show such negligence legally sufficient to go to the jury it should be submitted to it." The Court went on to say in that case that the evidence "was legally sufficient to go to the jury, tending to show contributory negligence on the part of McCabe, but it was not of a character that warranted the Court in holding that he was *Page 110 
guilty of contributory negligence as a matter of law." McCabe was sitting on the front seat with the driver, and it was shown that both looked and listened for trains, but heard no whistles or bells. At one point the driver stopped the automobile, and they looked up and down the track, and listened for a train, but they neither saw nor heard any. He then started forward towards the tracks, which were about thirty or thirty-five feet away. There was a watchman's box near the tracks which obstructed their view, but McCabe did not warn or advise the driver not to cross the tracks without again stopping at a point beyond the watchman's box, where he could have seen the oncoming train.
In the Crain Case the plaintiff testified that just before the accident she heard Mr. Goodman, the driver, tell Mr. Prutz, another passenger, that there was a crossing somewhere along there but just where it was located he did not know. The plaintiff was enjoying the scenery. There were poles fifteen or eighteen inches in diameter upon each side of the railroad track, at a distance not greater than 110 feet apart, with wires strung upon them, extending for at least half a mile to the westward, which located the railroad and the crossing upon the highway, and they were plainly visible at a point some distance from the crossing, thus pointing out the place of danger of which Goodman had given notice to those in the automobile, including the plaintiff. As the Court said, "it would seem that said poles and wires would have been noticed and observed by the plaintiff in the exercise of ordinary care and caution on her part to avoid the threatened danger, but if they were observed by her she made no mention of them." Yet the Court said that it would not hold as a matter of law she was guilty of contributory negligence, "but nevertheless we think the evidence tending to show a want of due care on her part — which under the circumstances she was bound to take — should have been submitted to the jury." In that case,Brommer v. P.R.R. Co., 179 F. 577, 29 L.R.A. (N.S.) 924, is referred to at some length and was said by JUDGE *Page 111 
PATTISON to be "very much like the case at bar." A quotation is made from it which included one from Davis v. Chicago, etc.,R.R. Co., 16 L.R.A. (N.S.) 424, 88 C.C.A. 496, 159 F. 18, which in part was as follows: "It is now the better recognized rule of law that as to such a person, situated as was the plaintiff, riding in a vehicle in mere companionship with his friend, engaged upon a mutual adventure, it is as much his duty as that of the driver to take observation of dangers, and to avoid them, if practicable, by suggestion and protest. In other words, he is required to exercise ordinary care to avoid injury." That is in substance stated in the syllabus of the Crain Case as a decision of this Court, although it is merely a quotation from the Brommer Case. But as will be seen by reference to them, each of the three cases cited in Crain's Case directly after the above quotation was submitted to the jury, and in the note inAnn. Cases 1916 E, 269, referred to below it is said: "Whether the occupant has exercised reasonable care under the circumstances is usually a question for the jury" — citing many cases, including Crain's Case. In United Rwys. Co. v.Biedler, 98 Md. 564, a prayer was granted containing an instruction that there was no evidence legally sufficient to show any negligence on the part of the plaintiff directly contributing to the happening of the injury complained of. In Hogeland'sCase, 66 Md. 149, the Court submitted the question to the jury, as was also done in B. O.R.R. Co. v. State, use of Strunz,79 Md. 335.
While there are cases in which the guests or occupants have been held guilty of such contributory negligence as to preclude recovery as matter of law, it will be found by an examination of the numerous cases on the subject that generally the question must be submitted to the jury. There are a great many cases on the general rule and exceptions to it which are cited in the note to Anthony v. Kiefner, Ann. Cas. 1916 E, 269, and in the note to Christopherson's Case, 28 N.D. 128, as reported in Ann.Cas. 1916 E, 685. In this *Page 112 
case we cannot say that the fact that there were four persons on the one seat, in the positions we have described, constituted contributory negligence as a matter of law on the part of Miss Hall. By reason of the position she occupied, it may have been more difficult for her to see whether there was anything in the way, or any car coming, as they approached the crossing. As she was on the left side (the one from which the car came) she probably had a better opportunity to see whether one was coming than the driver had, unless Jockell obstructed her view, when sitting partly on her lap and partly on the side of the automobile. Whether she thus voluntarily put herself in a position that prevented her from seeing or hearing an approaching car, or which interfered with the driver's view, as soon as he might have otherwise seen it, or interfered with his management of the car, were questions to be considered by the jury. Jockell testified that the car was "almost up to Hamburg Street" when he first saw it. As the street is 38 1/2 feet and the pavement 13 1/2 feet wide and they were near the north curb on Hamburg Street, the car must then have been about 50 feet from them. The defendant's engineer of maintenance of way testified, without contradiction, that a person four feet south of the north curb line on Hamburg Street and 10 feet east of the east building line of Scott Street could see 197 feet down Scott Street; that one seated in an automobile four feet south of the north curb line on Hamburg Street and 70 feet east of the east building line on Scott Street could see 70 feet down Scott Street and one at that building line (which is over 25 feet from the northbound track of the defendant) could see 1,200 feet down Scott Street, partially up the incline plane spoken of above. It is true that the measurements were taken in the daytime, but there was ample evidence tending to show that the car was well lighted and there was at least a dim headlight on it. There was, therefore, evidence to go to the jury as to whether the deceased was guilty of contributory negligence, and there was also evidence tending to show negligence on the part of *Page 113 
the defendant. The defendant's first and second prayers were therefore properly rejected.
So although we have reached the conclusion that it cannot properly be said as a matter of law that Maria L. Hall was guilty of contributory negligence, we will now consider it as referred to in the plaintiff's prayers. The first prayer submitted to the jury to find, amongst other things, "that said Kratzmeyer was in exclusive control of said automobile, and that the deceased was not driving said automobile and had no control over the driving or operation thereof," and again that "if the jury further find the deceased was exercising ordinary care and caution as a passenger in said automobile as the same was proceeding along Hamburg Street, approaching and crossing Scott Street, and that when she saw or heard, or by the exercise of ordinary care could have seen or heard the said interurban electric car approaching said intersection of Hamburg and Scott Streets, she could not have stopped said automobile or alighted therefrom before said collision or otherwise avoided said collision by the exercise of ordinary care and prudence on her part, if the jury shall so find, and that she did not contribute to the happening of said collision by the failure on her part to exercise ordinary care and caution." Inasmuch as that prayer specifically referred to Miss Hall not driving the automobile, not having control over it, etc. — thus emphasizing those matters — the jury might well have been misled as to other duties which she was called upon to perform in the exercise of due care, and which were more important to be considered by the jury under the circumstances of this case. Whether or not she used due care in looking for an approaching car and informing the driver of its approach, if she saw one, or could have seen it in time to warn the driver, whether the position she occupied in the car was negligence directly contributing to the accident and whether she should have warned the driver in approaching the crossing, if the jury found that the automobile was running at an excessive speed, were more material under the evidence, yet the *Page 114 
prayer only selected such matters as were not involved in much doubt, and specifically referred to them. Merely submitting such matters under the general statements, such as, "or otherwise (could have) avoided such collision by the exercise of ordinary care and prudence on her part," etc., was not enough.
Inasmuch as the jury were instructed that if they found the facts therein stated "their verdict should be for the plaintiff," and the prayer so prominently brought before them the questions referred to but omitted all reference to those which were actually the material facts to be determined in reference to her negligence it was a defective prayer. The only question we have had any doubt about was whether there was reversible error, inasmuch as the Court granted the defendant's seventh prayer, as to whether the deceased exercised ordinary care to ascertain whether or not an electric car was approaching, its eighth, as to whether the automobile was being operated at a rate of speed greater than was reasonble under the circumstances and whether she made objection to it, and protested against the speed, and its tenth as to whether she could, by the exercise of ordinary care and prudence, have seen the car and warned the driver of its approach in time to have prevented the accident, etc. Each of those prayers concluded with an instruction that the verdict of the jury should be for the defendant, if they found the facts set out. We are, of course, aware of the decisions of this and other courts to the effect that it may not be necessary to reverse a judgment by reason of some omission in a prayer of the successful party, if one was granted to the other party covering that question, and there was no danger of the jury being misled. But in this case the plaintiff selected some things which might be evidence of negligence and then omitted all other matters reflecting on that question excepting in so far as they were included in the general and indefinite statements of "exercising ordinary care and caution," "did not contribute to the happenings of said accident by the failure on her part to exercise ordinary care and caution," etc. The defendant's prayers were not mere modifications or qualifications of plaintiff's *Page 115 
first prayer, but if the jury found what was submitted in either of them it was entitled to a verdict. Yet the record does not show that the jury's attention was called to those prayers in connection with the granting of the plaintiff's prayer, or that they were in any way specially referred to. When the jury were considering the prayers, as they presumably did, if they took up the plaintiff's prayer and found against the defendant on all the facts specified in it, they were told to render a verdict for the plaintiff. They would not, or at least might not, have understood that in passing on the question of ordinary care they should consider the matters submitted by the defendant's prayers. At best they might have said that the Court has instructed us that if we find these facts we must find for the plaintiff, and if we find these other facts we must find for the defendant, and have become confused as to their duty. It would have been different if the plaintiff's prayer had not specifically pointed out and segregated certain matters reflecting upon the negligence of the deceased. In the case of B. O.R.R. Co. v. Blocher,27 Md. 277, the Court had granted a prayer for the defendant which the plaintiff claimed cured an omission in his prayer, and contended that the words "and without any fault on his part" were sufficient to cover what had been omitted from the plaintiff's prayer. But the Court said that those words "are too general, vague and indefinite to be regarded as a recognition of the same right. The theories of these prayers were prima facie directly opposed. The jury could not, without disregarding one or the other, come to any correct conclusion. According to the ruling of the Court in Adams v. Capron, 21 Md. Rep. 186, and in Haney
v. Marshall, 9 Md. 215, this conflict between the prayers is error, as it was calculated to mislead the jury, leaving them in doubt which should control." The judgment was reversed in part for that error. See also Crain's Case, in reference to the plaintiff's prayer; Williar v. Nagle, 109 Md. 80-83; DiGiorgio Co. v. Stock, 116 Md. 201, 208; Thomas on Prayers andInstructions, Sec. 30f, 35 and 36. As we regard these *Page 116 
prayers as contradictory, and not merely qualifying or modifying, we cannot hold that the error in the plaintiff's first prayer was corrected by the defendant's prayers and would be inclined to reverse the judgment for that error, if there was no other.
But that first prayer and the defendant's fifth were clearly repugnant and contradictory. The only reference in the plaintiff's first prayer to Kratzmeyer's care and caution is: "and that the said Kratzmeyer was driving said automobile at a reasonable rate of speed along Hamburg Street, approaching Scott Street, and that he had said automobile under control," but by the defendant's fifth the jury was instructed, "that if they shall find from the evidence that at the time of the accident mentioned in the testimony the deceased Maria Hall was a passenger in the automobile mentioned in the evidence, then it was the duty of the driver of the automobile to exercise the highest degree of care and skill practicable under all the circumstances for her care and safety, and if the jury shall further find that the driver of the automobile failed to use such care and that his failure to do so was the direct and proximate cause of the accident, without which the accident would not have occurred, if the jury so find, then the verdict of the jury should be for the defendant."
That prayer is precisely like defendant's D prayer in Crain'sCase, which we said should have been granted as offered. The plaintiff's prayer concluded by an instruction that if they found the facts therein stated the verdict of the jury should be for the plaintiff, yet it utterly ignored all questions of negligence of Kratzmeyer, excepting what we have quoted above as to the speed he was running and having the automobile under control, but the defendant's fifth prayer directed the verdict for the defendant if the jury found him negligent as therein stated. There was ample evidence tending to show negligence on his part, which was for the jury to determine. For instance, that of a passenger on the electric car tended to show that Kratzmeyer attempted to run around *Page 117 
and in front of the car, and his own evidence furnishes some ground for such an inference. One of the plaintiff's witnesses testified that as he walked down Scott Street towards Hamburg he had seen and heard the car three or four squares off, and two disinterested witnesses standing on the southwest corner of the streets testified that they saw the car coming at a moderate rate of speed and that the automobile was running very rapidly. But the plaintiff's prayer did not submit such questions, either specifically or generally to the jury. There was, therefore, an irreconcilable conflict between those prayers, and under the authorities we cited above, to which may be added 2 Poe, Pl. Pr., Sec. 300, it was reversible error to grant such conflicting prayers.
We deem it proper to add that although we did approve a similar prayer in Crain's Case, and hence the lower Court was justified in granting the fifth prayer, as it was a part of the law of the State, we think that the degree of care imposed on the driver by it is not justified by the facts of this case, and we must say was not in the Crain Case. Miss Hall was not a passenger for hire, but was simply a guest or occupant of the automobile by invitation of the owner. He was not a common carrier, certainly was not on the occasion of the accident, but like most other people he was the owner of the automobile for his own pleasure and purposes so far as the record shows. Such a driver should not be held to "the highest degree of care and skill practicable under all the circumstances" for the care and safety of his guest, and we are not aware of any authority in this State, or any outside of it which would be binding on us that so holds, except the Crain Case. In Huddy on Automobiles, Sec. 113, page 139, it is said: "In considering the rights of a guest we have a different situation presented, although he pays nothing for riding, he is, nevertheless, in the care and custody of the owner or driver of the machine and is entitled to a reasonable degree of care for his safety." There are a great many cases cited in 2 Words and Phrases, 2nd Series, on pages 875-876, as *Page 118 
to the signification and meaning of the expression "highest degree of care" but it is not necessary to do more than refer to them. The degree of care required of a driver for the safety of his guest must depend largely upon the circumstances of each particular case, but there is nothing in this record to justify the use of that expression. As defendant's D prayer granted as modified in the Crain Case included that statement as to the care required, as well as the one offered, which we held should have been granted, our attention was not fixed on that but rather as to the effect of the modification. Hereafter when such a prayer is offered it should be so drawn as not to require such a high degree of care, when the injured party was a mere guest or occupant on the invitation of the driver or owner of the automobile, unless under some very peculiar circumstances.
Our understanding of what is meant by the concluding part of the prayer is that if the accident is caused wholly by the negligence of the driver, which was the direct and proximate cause of the accident, which would not have happened except for such negligence or failure of the driver to use proper and reasonable care, then the railway company is not responsible because the accident was not due to its negligence. It is not a question as to whether the negligence of the driver is to be imputed to the guest or occupant, but if the driver caused the accident there could be no reason why a third party should be held responsible for it. The case of Bagwell v. Southern R.Co., 167 N.C. 611, is an illustration of what we mean. That part of the prayer as to proximate cause might perhaps be improved on so as to show that the negligence of the driver was the sole, only and proximate cause of the accident. The fifth prayer of defendant was not of much use with the plaintiff's first before the jury.
Then there was no reference made in any of the plaintiff's prayers as to whether Naomi Hall was a legitimate child of Maria Hall, or to the effect of it, if she was not. The only evidence on the subject of the marriage of Maria was that of her mother and of Jockell. She was asked, "When was your *Page 119 
daughter married?" and replied, "I couldn't tell you that. I know she went off and told me that she had got married." In another place she said she was away from home a day and night, and told her that she had married George Kelly. Jockell, one of the plaintiff's witnesses, said she was unmarried. She and Kelly never lived together, and she went by the name of Miss Hall. Her declaration that she was married was admissible under Craufurd
v. Blackburn, 17 Md. 49, and Jackson v. Jackson,80 Md. 176, but as another witness of the plaintiff swore she was unmarried, which statement was corroborated by the circumstances referred to, it was for the jury to determine, and ought not to have been assumed. Of course, that would only be relevant if an illegitimate child cannot recover under our statute for Negligence Causing Death, Art. 67 of the Code. In the recent case of Fredericka Scott v. The Independent Ice Co. et al.,135 Md. 343, we determined that illegitimate children were not entitled to compensation under our Workmen's Compensation Act for the death of their father. We referred to all of our statutes on the subject of illegitimate children, and pointed out the fact that some distinction was made by our statutes between the rights of such children in their father's estates from those in their mothers' estates. But in considering that case we said: "It could scarcely be contended that under our statute for negligence causing death (Art. 67 of the Code), an action could be maintained for the use of an illegitimate child, where it is said in Sec. 2 that `Every such action shall be for the benefit of the wife, husband, parent and child of the person whose death shall have been so caused.'" We also referred to 5 Am. Eng. Enc. ofLaw, 1095, where it is said that, "It is a rule of construction that prima facie the word `child' or `children,' when used in a statute, will or deed, means legitimate child or children. In other words bastards are not within the term `child' or `children.'" See also 7 C.J. 959. We also referred toMcDonald v. P.C.C. St. Louis Ry. Co., 144 Ind. 459, reported in 32 L.R.A. 309, where it *Page 120 
was held that what corresponds with our statute gave no right of action to a father for the death of his illegitimate child. A number of authorities are cited in that opinion to the effect that when a statute gives the right of action to children, it means legitimate children only. In 1 Poe, Pl. Pr., Sec. 453, in speaking of this statute, it is said: "The word `child' has been held in England to mean legitimate child. There is no decision upon the precise point in Maryland, but no doubt the same interpretation will be adopted." In Tucker v. State, useof Johnson, 89 Md. 479, we held that the statute "has created a new cause of action for something for which the deceased person never had, and never could have had, the right to sue — that is to say, the injury resulting from his death." In Stewart v.United Elec. L. P. Co., 104 Md. 332, the question was whether an administrator or executor of a party could sue to recover damages for injuries received by the decedent through the wrongful act, neglect and default of the defendants. We held that under Sec. 103 (now 104) of Art. 93 and Art. 67 there were two separate and distinct causes of action arising out of the same wrongful act, that Art. 67 created a new cause of action, one which the decedent never had, and the damages in it are measured by the pecuniary value of his life to his family, and are not part of the assets of his estate, that Art. 93, § 103 (104), provided for the survival of a cause of action which the deceased himself had, that the sum recovered is an asset of his estate, and neither of those actions is a substitute for the other and both may be maintained concurrently. It would seem, therefore, that even if an illegitimate child could get the benefit of damages recovered by an executor or administrator of its mother, that would not give it the right to sue under this statute. InDronenburg v. Harris, 108 Md. 597, the Court through JUDGE THOMAS held that money collected in a suit in the District of Columbia by an administrator for the death of the deceased, and turned over to an administrator in this State, was to be distributed to the persons designated by the *Page 121 
statute in effect in the District, and did not constitute assets of the estate of the decedent distributable under the statute of distribution of this State. Under the statute in the District of Columbia the suit for the wrongful death of a party, under what we usually speak of as Lord Campbell's Act, is brought in the name of the administrator. So without pursuing this subject further we are forced to the conclusion that an illegitimate child cannot sue under the provisions of Art. 67 of the Code, and hence Naomi Hall was not entitled to recover, if she is such. It follows from what we have said that plaintiff's first and third prayers were improperly granted. The defendant's third prayer was properly rejected as it was a question for the jury. We see no reason why the action of the Court in rejecting the third and one-half prayer was not correct. We have not thought it necessary to discuss the plaintiff's second prayer, although it would be better under such circumstances as exist in this case to inform the jury that that did not entitle the passenger to recover if guilty of negligence directly contributing to the accident.
Without discussing them we find no reversible error in the other exceptions, but must reverse the judgment for the reasons stated.
Judgment reversed and new trial awarded, Amelia Hall, anequitable plaintiff and next friend of the infant, to pay thecosts. *Page 122