775 A.2d 476

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY et al.**

v.

**Terrence Brett HILL et al.**

**No. 1143, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

July 3, 2001.

Lawrence E. Ballantine (H. Barritt Peterson, Jr. & Associates, on brief), Towson, for appellant State Farm.

Patrick J. Nooney (Patrick J. Nooney, P.A., on brief), Hagerstown, for appellant Nationwide.

Dennis F. O'Brien (Foard, Gisriel, O'Brien & Ward, L.L.C., Towson, and Terry Myers (Myers & Proctor), Hagerstown, on brief), for appellees.

Argued before SALMON, ADKINS, and MICHELE D. HOTTEN (Specially Assigned), JJ.

SALMON, Judge.

In this appeal we are asked to decide whether the fireman's rule is applicable when police officers sue a defendant who intentionally harms them. Other related issues are presented, *viz,* whether contributory negligence or assumption of risk are valid defenses to a personal injury claim arising out of intentional torts. In addition, we are called upon to interpret section 19–513(e) of the Insurance article of the Maryland Code (1997). The statutory construction issue is: When a plaintiff receives a civil judgment and a workers' compensation award arising out of the same incident, is $20,000 the maxi-

mum worker's compensation benefit credit allowable against the judgment under section 19–513(e)?

## I.

Adam Rozas stole a Chevrolet S–10 pick-up truck in Martinsburg, West Virginia, on November 12, 1995. He was fifteen years old at the time.

West Virginia police officers spotted Rozas driving the stolen truck on the evening of November 12th and gave chase. Rozas drove, at extremely high rates of speed, into Virginia and then into Western Maryland with the police in hot pursuit. Once in Maryland, Rozas's reckless actions included topping a hill crest on the wrong side of the road, driving through the town of Boonsboro, Maryland, going between fifty and sixty miles per hour, and driving at speeds up to one hundred miles per hour in open country.

Maryland police authorities were notified of Rozas's actions, and several Maryland State Police officers joined in his pursuit. Among the Maryland State Police officers who tried to stop Rozas were Corporal Terrence Hill[1] and Trooper Richard Poffenberger.

Trooper Poffenberger and Corporal Hill, among others, were ordered to execute a "rolling roadblock" to stop the stolen vehicle. The goal of a rolling roadblock is to "box in" and eventually force an uncooperative motorist to stop his or her vehicle. It is executed by having one, or more, police officers in front of the vehicle being chased, and at least one car immediately behind the target vehicle. Initially, the police vehicles drive at the same speed as the car they are trying to stop; the lead car then gradually reduces its speed, which (hopefully) will cause the car being pursued to do likewise; if the car being chased reduces its speed, the lead car comes to a gradual halt—thereby causing the vehicle in the middle to do likewise.

---

1. Hill was promoted after the incident here at issue; on November 12, 1995, Hill's rank was Trooper First Class.

Both Corporal Hill and Trooper Poffenberger had performed rolling roadblocks prior to November 12th, and both appreciated the fact that they risked serious personal injury whenever they attempted to stop an uncooperative motorist in this manner. Despite the known danger, Corporal Hill drove to Alternate Route 40—a two-lane highway—and waited for Rozas to approach from the east. Eventually he observed Rozas, driving at a high rate of speed, going westbound. Corporal Hill, with his emergency lights activated, pulled from the side of the road and accelerated up to Rozas's speed as Rozas approached rapidly from behind. Shortly thereafter, Rozas was "boxed in" with Corporal Hill in front and another state police vehicle immediately behind. The vehicles then approached a dangerous stretch of roadway known, ominously, as "Deadman's Curve." All three vehicles negotiated Deadman's Curve successfully but, in doing so, skidded dangerously. Immediately after meeting this challenge, Rozas struck Corporal Hill's cruiser in the rear, causing it to "fishtail." Corporal Hill regained control over his vehicle, but then Rozas forcefully struck the vehicle again, causing Corporal Hill to lose control of his vehicle. The police cruiser spun across the eastbound lane of traffic into a guardrail and then came to rest.

As a result of the collision with Corporal Hill's car, Rozas's stolen vehicle was damaged. This damage caused Rozas to slow down to about forty to fifty miles per hour.

With Corporal Hill's vehicle disabled, Trooper Poffenberger managed to get in front of Rozas's vehicle, and another police vehicle still trailed Rozas. At that point, Rozas had four options: he could attempt to pass on the right shoulder; he could drive into the eastbound lane and attempt to pass; he could slow his vehicle to a stop; or he could accelerate forward and strike Trooper Poffenberger's vehicle in the rear. Rozas took the last-mentioned option. Trooper Poffenberger, however, did not lose control of his vehicle despite the impact, but about this time he concluded that Rozas had to be brought to a halt immediately because the rolling roadblock was approaching a more heavily populated area. With that in mind,

Trooper Poffenberger decided "to slow down rapidly" in front of Rozas. When Trooper Poffenberger did so, his vehicle was struck in the rear with great force by the stolen vehicle, and the police car rotated clockwise, then slammed into an embankment. The impact between the stolen vehicle and Trooper Poffenberger's cruiser caused Rozas to lose control of his vehicle, and he, too, came to a stop.

Both Corporal Hill and Trooper Poffenberger were injured as a result of Rozas's actions, and both officers brought workers' compensation claims for injuries arising out of the collisions just described. Corporal Hill received workers' compensation benefits in the amount of $30,583.51, and Trooper Poffenberger was awarded $13,500 in benefits.

At the time of the November 12, 1995, incident Rozas was uninsured. Corporal Hill was insured under an automobile policy issued by State Farm Mutual Insurance Company ("State Farm"), which provided him with uninsured motorist ("U.M.") coverage. Trooper Poffenberger also had U.M. coverage under a personal automobile policy issued to him by Nationwide Insurance Company ("Nationwide").

## II.

Corporal Hill and Trooper Poffenberger filed separate lawsuits in the Circuit Court for Washington County against their U.M. carriers and Rozas. As originally drafted, the complaints alleged that Rozas's *negligence* caused their injuries. Later the complaints were amended to allege, in the alternative, that the plaintiffs were intentionally injured by Rozas. The two cases were consolidated for trial.

Rozas did not appear at trial, but attorneys for the two insurance companies were present. At the end of the plaintiffs' case and at the end of the entire case, both Nationwide and State Farm moved for judgment in their favor.[2] State

---

2. The motions for judgment were made pursuant to Maryland Rule 2–519(a), which provides:

Farm argued that Corporal Hill's claim against Rozas was barred by both the fireman's rule and the assumption of risk doctrine. Nationwide contended that Trooper Poffenberger's claim was barred for the same reasons as those advanced by State Farm; Nationwide also argued that Trooper Poffenberger had forfeited any right to recover against Rozas due to his own contributory negligence.

The trial judge denied the motions of both insurance carriers. The jury, answering questions on a special verdict form, found, *inter alia,* that (1) Rozas intentionally caused injury to Corporal Hill and Trooper Poffenberger; (2) neither Corporal Hill nor Trooper Poffenberger assumed the risk of injury; and (3) Trooper Poffenberger was not guilty of contributory negligence.[3]

The jury decided that Corporal Hill suffered damages in the total amount of $85,595 as a result of the November 12, 1995, incident, and that Trooper Poffenberger suffered injuries worth $30,624.32.

Both insurance carriers filed motions for judgment notwithstanding the verdict. They argued that the judgments against them should be set aside for the same reasons that they advanced in their motions for judgment made during the trial. In addition, both State Farm and Nationwide filed motions to alter or amend judgment, in which they asked that the judgments be reduced (pursuant to section 19–513(e) of the Insur-

---

(a) **Generally.** A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

3. The jury also found that the injuries suffered by the two police officers were caused by the negligence of Rozas. The appellants, perhaps mindful of "the principle that an appellate court must view a case in a way that reconciles the jury's verdicts if at all possible," do not contend that the verdicts were fatally inconsistent. *See Eagle–Picher Indus., Inc. v. Balbos,* 84 Md.App. 10, 35 n. 12, 578 A.2d 228 (1990).

ance article) by the amounts of workers' compensation benefits received by each plaintiff. The trial court denied the motions for judgment notwithstanding the verdict but granted the motions to alter or amend judgments; the court reduced Corporal Hill's judgment to $55,011.49 ($85,595—30,583.51); Trooper Poffenberger's judgment was reduced to $17,093.35 ($30,624.32—13,530.97).

### III.

Neither State Farm nor Nationwide contests coverage for the harm caused to their insureds by Rozas. Furthermore, the insurers do not claim that the evidence was insufficient to support the conclusion that Rozas intentionally caused injury to the plaintiffs. At bottom, they contend that because Rozas should not have been liable to the plaintiffs, neither should they be held liable.

### A. *Contributory Negligence*

Nationwide maintains that the trial judge erred in denying its motion for judgment on the ground that Trooper Poffenberger, as a matter of law, was guilty of contributory negligence and therefore Rozas was not liable to him.[4] In support of its argument, Nationwide quotes *Campbell v. Montgomery County Board of Education,* 73 Md.App. 54, 64–65, 533 A.2d 9 (1987):

> Contributory negligence, it is said, "occurs whenever the injured person acts or fails to act in a manner consistent with the knowledge or appreciation, actual or implied, of the danger or injury that his or her conduct involves." Gilbert, *Maryland Tort Law Handbook,* § 11.4.1; *Schwier v. Gray,* 277 Md. 631, 357 A.2d 100 (1976).

---

**4.** Nationwide also contends that the trial judge erred in denying its motion for summary judgment and its motion for judgment notwithstanding the verdict on the ground of contributory negligence. The issues raised are exactly the same in all three motions and therefore need not be discussed separately.

A case may not be taken from a jury on the ground of contributory negligence unless the evidence demonstrates "some prominent and decisive act which directly contributed to the ... [incident] and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Balto. [Baltimore] Transit Co. v. [State for Use of] Castranda,* 194 Md. 421, 434, 71 A.2d 442, 447 (1950); *Baltimore & O.R.R. v. Plews,* 262 Md. 442, 278 A.2d 287 (1971); *see also Kirby v. Hylton,* 51 Md.App. 365, 443 A.2d 640 (1982); *Rafferty v. Weimer,* 36 Md.App. 98, 373 A.2d 64 (1977)[;] *Myerberg v. Thomas,* 13 Md.App. 539, 284 A.2d 29 (1971).

*Id.*

Nationwide continues,

... Nationwide ... maintains and asserts that on these facts, there is no room for difference of opinion thereon by reasonable minds, and that the Circuit Court erred in denying the Motions for Judgment ... in favor of ... Nationwide ... on the grounds that ... Poffenberger was himself contributorily negligent, which was a[,] or the[,] proximate cause of the accident in the present case.

■ Overlooked in this argument is the fact that the jury found that Rozas intentionally injured Trooper Poffenberger. Rozas's actions therefore constituted battery.

*Restatement (Second) of Torts* reads as follows:

§ 481. Intentional Injury

The plaintiff's contributory negligence does not bar recovery against a defendant for a harm caused by conduct of the defendant which is wrongful because it is intended to cause harm to some legally protected interest of the plaintiff or a third person.

*Restatement (Second) of Torts* § 481 (1965).

In *Prosser and Keeton on the Law of Torts,* the authors state:

The ordinary contributory negligence of the plaintiff is to be set over against the ordinary negligence of the defendant, to

bar the action. But where the defendant's conduct is actually intended to inflict harm upon the plaintiff, there is a difference, not merely in degree but in the kind of fault; and the defense never has been extended to such intentional torts. Thus it is no defense to assault or battery.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 462 (5th ed.1984) (footnotes omitted); *see also* Stuart M. Speiser, et al., *The American Law of Torts* § 12.9, at 535–36 (1986).

In *Saba v. Darling,* 72 Md.App. 487, 531 A.2d 696 (1987), the defendant intentionally punched the plaintiff (Saba) in the jaw. Nevertheless, in an apparent effort to obtain insurance coverage for the defendant's wrongful action, the plaintiff dropped his battery claim against the defendant and sued him for negligence only. The trial judge instructed the jury as to the defense of contributory negligence. *Id.* at 490, 531 A.2d 696. We said in *Saba* that, inasmuch as it was undisputed that the defendant intentionally struck Saba in the jaw, the defendant was not guilty of negligence but rather was guilty of battery. *Id.* at 491–92, 531 A.2d 696 (quoting, as we have done, *Prosser and Keeton on Torts,* and § 482 of the *Restatement (Second) of Torts* (1965)). We held in *Saba* that the trial judge erred in instructing the jury regarding contributory negligence because that defense has no applicability when a defendant intentionally causes the plaintiff's injury. *Id.* at 492, 531 A.2d 696.

Since the *Saba* decision, both the Court of Appeals and this Court have said, albeit in *dicta,* that the plaintiff's own negligence is not a defense to an intentional tort. *See JBG/Twinbrook Metro L.P. v. Wheeler,* 346 Md. 601, 620, 697 A.2d 898 (1997) (citing *Victor v. Sell,* 301 Minn. 309, 222 N.W.2d 337, 341 (1974) and authorities cited therein); *Janelsins v. Button,* 102 Md.App. 30, 41–43, 648 A.2d 1039 (1994). Earlier, in *Tucker v. State,* 89 Md. 471, 43 A. 778 (1899), the Court of Appeals said that the "authorities seem to agree that the doctrine of contributory negligence can have no application when the action is founded on intentional violence." *Id.* at 486, 43 A. 778.

Nationwide cites no authority, and we have found none, which would allow the contributory negligence of a plaintiff to bar a claim when the defendant intentionally injured the plaintiff. Intentional torts, such as the one committed by Rozas, are morally wrong and thus fundamentally different from acts of mere negligence. There is no valid public policy reason why the contributory negligence of a plaintiff should ever bar a claim for acts of the defendant that were intended to cause harm.

## B. *Assumption of Risk*

As already mentioned, both State Farm and Nationwide claim that the doctrine of assumption of risk was a complete bar to the claims of Corporal Hill and Trooper Poffenberger against Rozas. We reject that argument based on the holding in *Janelsins*, 102 Md.App. at 39, 648 A.2d 1039, which was cited with approval by the Court of Appeals in *JBG/Twinbrook*, 346 Md. at 621, 697 A.2d 898.

In *Janelsins*, the defendant was a patron at a bar who became inebriated; the plaintiff, Button, helped to escort the defendant to his automobile. *Janelsins*, 102 Md.App. at 34, 648 A.2d 1039. When Button (and others) tried to force the defendant into the backseat of his car, so that he would not attempt to drive home, the defendant kicked Button in the face. *Id.* Button brought a civil battery action against the defendant. *Id.* at 33, 648 A.2d 1039. At the conclusion of the case, the defendant made a motion for judgment and contended that Button's battery claim was barred by the assumption of risk doctrine. *Id.* at 34, 648 A.2d 1039. The trial judge rejected that argument and so did we. *Id.* After a thorough review of the authorities, Judge Hollander, for this Court, said:

> Because of the legitimate public policy of deterring and punishing intentional wrong-doing, the fact that a plaintiff "assumed the risk" that such wrongdoing would occur cannot bar recovery for the wrongs perpetrated. Although Button certainly knew that Janelsins was intoxicated and, after Janelsins began to resist forcibly, nevertheless contin-

ued to push Janelsins into his car, Button did not assume the risk of battery.

*Id.* at 44–45, 648 A.2d 1039.

We hold that Corporal Hill's and Trooper Poffenberger's battery claims were not barred by the assumption of risk doctrine.

### C. *The Fireman's Rule* [5]

■ Maryland's present version of the fireman's rule was set forth in *Flowers v. Rock Creek Terrace, L.P.*, 308 Md. 432, 520 A.2d 361 (1987), as follows:

> [F]iremen and police officers generally cannot recover for injuries attributable to the negligence that requires their assistance. . . . A fireman or police officer may not recover if injured by the negligently created risk that was the very reason for his presence on the scene in his occupational capacity. Someone who negligently creates the need for a public safety officer will not be liable to a fireman or policeman for injuries caused by this negligence.

*Id.* at 447–48, 520 A.2d 361. Notwithstanding the fact that the fireman's rule speaks of a bar to claims of negligence, both State Farm and Nationwide contend that the fireman's rule should prohibit appellees from recovering against Rozas for the latter's actions, which were intended to cause harm.

Twenty-four states and the District of Columbia have adopted some form of the fireman's rule by statute or by caselaw. *See Waggoner v. Troutman Oil Co.*, 320 Ark. 56, 894 S.W.2d 913, 914–15 (1995) (listing the jurisdictions that have

---

**5.** For an up-to-date discussion of the fireman's rule in Maryland see an article by Margaret Fonshell Ward, *Clearing the Smoke Around the Fireman's Rule,* Maryland Bar Journal, May/June 2001, at 48. *See also* Ami C. Dwyer, Note, *The Fireman's Rule—Public Policy or Premises Liability? The Proper Basis for the Firefighter's Rule in Maryland. Southland Corp. v. Griffith, 332 Md. 704, 633 A.2d 84 (1993),* 24 U. Balt. L.Rev. 229 (1994); David L. Strauss, Comment, *Where There's Smoke, There's the Firefighter's Rule: Containing the Conflagration After One Hundred Years,* 1992 Wis. L.Rev.2031 (1992) (providing an enlightening national overview of the rule).

adopted the rule). Three states have rejected the fireman's rule either by statute, Minn.Stat., 604.06 (1984); Fla. Stat., Ch. 112.182 (1990), or by case law, *Christensen v. Murphy*, 296 Or. 610, 678 P.2d 1210 (1984). *See id.*

The California Court of Appeals, on at least two occasions, has barred recovery for a police officer's injury by application of the fireman's rule in situations where the police officer was injured by the intentional acts of the defendant. *See City of Los Angeles v. O'Brian*, 154 Cal.App.3d 904, 201 Cal.Rptr. 561 (2d Dist.1984); *Lenthall v. Maxwell*, 138 Cal.App.3d 716, 188 Cal.Rptr. 260 (2d Dist.1982).

In *Lenthall*, a police officer employed by the City of San Luis Obispo received a call to respond to the defendant's home because of a domestic dispute with "possibly shots fired." *Lenthall*, 188 Cal.Rptr. at 261. Upon arrival at the defendant's residence, the plaintiff, a police officer, was shot and injured by the defendant. *Id.* The police officer sued the person who had intentionally shot him, but the trial court granted summary judgment in favor of the defendant based on the fireman's rule. *Id.* The lower court was affirmed on appeal. *Id.* The *Lenthall* court explained:

> Our reading of the cases cited to us leads us to conclude as follows: (1) The rule does not apply to injuries inflicted by an independent *actor* not connected with the event bringing the officer to the place of injury; (2) the rule does not apply to injuries caused by conduct which the officer could not reasonably anticipate would occur by reason of his presence at the place of injury; (3) but that the rule does apply to injuries inflicted by a participant in the event bringing the officer to the place of injury and the act causing the injury is one which the officer should reasonably expect to occur while he was engaged in the duty bringing him to the place of injury.

> As applied to the case before us, a police officer called to subdue a violent offense involving firearms, should reasonably anticipate that one of the persons whom he was called

on to subdue might resist him by use of the firearms involved.

*Id.* at 261–62.

In the case of *City of Los Angeles v. O'Brian,* a police officer saw the defendant driving a stolen van. *O'Brian,* 201 Cal.Rptr. at 562. The officer, driving a marked police cruiser, followed the stolen van until it stopped at a red light. *Id.* The police cruiser came to a stop approximately twenty feet behind the defendant's vehicle, whereupon the defendant backed up at a rate of about twenty miles per hour and struck the patrol car, injuring the police officer and damaging his vehicle. *Id.* The stolen van then sped away. *Id.* Other police officers later stopped the stolen vehicle and arrested the driver. *Id.* The city sued the driver of the stolen van in an attempt to recover the monies it had expended for workers' compensation benefits paid to the injured police officer, together with monies expended to repair the police vehicle. *Id.* The trial court granted summary judgment in favor of the defendant. *Id.* On appeal, the *O'Brian* Court, citing *Lenthall, supra,* affirmed the trial court and held that the fireman's rule was applicable even for intentional torts. The Court said:

> We conclude that an officer, engaged in a high speed chase of a law violator, should foresee the possibility of a collision. Here, however, the officer was not "chasing" the van but, as the city argues, had deliberately taken such care as was possible to avoid that kind of risk. However, we feel that a police officer, "trailing" a criminal suspect, in a marked police car, should foresee the possibility that the quarry may take measures to avoid apprehension and that ramming the pursuing vehicle is not such an unusual tactic as to render the injury not part of the risks of the police conduct. That being the case, the application of the [fireman's] rule to this case was proper.

*Id.*

Despite the holdings in *Lenthall* and *O'Brian,* it is clear that if those cases were decided under current California law the fireman's rule *would not* bar the claims of police officers

who are injured initially by a defendant. *See Gibb v. Stetson,* 199 Cal.App.3d 1008, 245 Cal.Rptr. 283, 287 (2d Dist.1988). In 1982, the California legislature enacted Civil Code section 1714.9 (Stats.1982, ch. 258, § 2, 836–37), which provides several important exceptions to the fireman's rule. One of those exceptions provides that a defendant is liable for injuries caused to a peace officer when the conduct causing injury was intended to injure. *See* Cal. Civ.Code § 1714.9(a)(3) (Deering 2001); [6] *Gibb,* 245 Cal.Rptr. at 286.

---

**6.** Deering's California Civil Code Annotated, section 1714.9 (2001), provides:

> Liability for injury to peace officer, firefighter or emergency medical personnel
>
> (a) *Notwithstanding statutory or decisional law to the contrary, any person is responsible not only for the results of that person's willful acts causing injury to a peace officer,* firefighter, or any emergency medical personnel employed by a public entity, but also for any injury occasioned to that person by the want of ordinary care or skill in the management of the person's property or person, in any of the following situations:
>
> (1) Where the conduct causing the injury occurs after the person knows or should have known of the presence of the peace officer, firefighter, or emergency medical personnel.
>
> (2) Where the conduct causing the injury occurs after the person knows or should have known of the presence of the peace officer, firefighter, or emergency medial personnel, violates a statute, ordinance, or regulation, and was the proximate cause of an injury which the statute, ordinance, or regulation was designed to prevent, and the statute, ordinance, or regulation was designed to protect the peace officer, firefighter, or emergency medical personnel.
>
> As used in this subdivision, a statute, ordinance, or regulation prohibiting resistance or requiring a person to comply with an order of a peace officer or firefighter is designed to protect the peace officer, firefighter, or emergency medical personnel.
>
> (3) *Where the conduct causing the injury was intended to injure the peace officer,* firefighter, or emergency medical personnel.
>
> (4) Where the conduct causing the injury is arson as defined in Section 451 of the Penal Code.
>
> (b) This section does not preclude the reduction of an award of damages because of the comparative fault of the peace officer or firefighter in causing the injury.
>
> (c) The employer of a firefighter, peace officer or emergency medical personnel may be subrogated to the rights granted by this section to the extent of the worker's compensation benefits, and other liabilities of the employer, including all salary, wage, pension, or other emolument paid to the employee or the employee's dependents.

Numerous cases from other jurisdictions have held, or said in *dicta*, that the fireman's rule does not protect a defendant who intentionally causes injury to a public safety employee. *See Diaz v. Salazar,* 924 F.Supp. 1088, 1100 (D.N.M.1996) (held: fireman's rule is not applicable in the context of intentional torts); *Alvarado v. United States,* 798 F.Supp. 84, 87 (D.P.R.1992) (*dicta:* fireman's rule does not bar recovery for intentional conduct); *Bates v. McKeon,* 650 F.Supp. 476, 480 (D.Conn.1986) (held: fireman's rule does not bar claims for intentional torts); *Fox v. Hawkins,* 594 N.E.2d 493, 498 (Ind.Ct.App.1992) (*dicta:* fireman's rule would not bar claim for willful, wanton, or intentional conduct); *Rennenger v. Pacesetter Co.,* 558 N.W.2d 419, 421 (Iowa 1997) (*dicta:* policemen not barred from recovery for intentional acts of misconduct by a third party); *Worley v. Winston,* 550 So.2d 694, 697 (La.Ct.App.2d Cir.1989) (held: professional rescuers rule does not bar recovery for "particularly blameworthy conduct, especially intentional criminal conduct"); *Wilde v. Gilland,* 189 Mich.App. 553, 473 N.W.2d 718, 719 (1991) (held: fireman's rule does not bar claims for intentional misconduct); *Lang v. Glusica,* 393 N.W.2d 181, 183 (Minn.1986) (held: fireman's rule does not bar recovery for intentional harm); *Lambert v. Schaefer,* 839 S.W.2d 27, 29–30 (Mo.Ct.App.1992) (held: fireman's rule does not bar recovery for intentional torts); *Migdal v. Stamp,* 132 N.H. 171, 564 A.2d 826, 828 (1989) (held: exceptions to the fireman's rule exist for wanton or reckless conduct and for positive acts of misconduct); *Mahoney v. Carus Chem. Co.,* 102 N.J. 564, 510 A.2d 4, 9 (1986) (held: fireman's rule does not bar recovery for intentionally caused injuries); *Phalen v. Kane,* 192 A.D.2d 186, 600 N.Y.S.2d 988, 989 (4th Dep't 1993) (held: fireman's rule does not bar actions for intentional misconduct); *Carson v. Headrick,* 900 S.W.2d 685, 690–91 (Tenn.1995) (held: fireman's rule does not prohibit recovery for "intentional, malicious, or reckless acts of a citizen"); *Juhl v. Airington,* 936 S.W.2d 640, 648 (Tex.1996)

---

(d) The liability imposed by this section shall not apply to an employer of a peace officer, firefighter, or emergency service personnel. (Emphasis added.)

(Gonzalez, J., concurring) (*dicta:* fireman's rule does not apply when officer is injured by intentional, malicious, or reckless conduct); *Goodwin v. Hare*, 246 Va. 402, 436 S.E.2d 605, 606 (1993) (held: fireman's rule does not bar claims for intentional torts); *Ballou v. Nelson*, 67 Wash.App. 67, 834 P.2d 97, 101 (1992) (held: fireman's rule does not bar where officer is injured by an "intentional, unlawful assault").

The case that sets forth the most cogent explanation as to why the fireman's rule does not bar a public safety officer's claim when the defendant intentionally causes harm is *Berko v. Freda*, 93 N.J. 81, 459 A.2d 663 (1983). The facts in *Berko* are somewhat similar to the ones in the case *sub judice.* Berko, a police officer, received word that Harrigan, a juvenile, was driving a stolen van. *Id.* at 664. Berko gave chase and was able to bring the stolen vehicle to a halt. *Id.* While Berko was attempting to remove Harrigan from the stolen vehicle through an open door, Harrigan's foot hit the gas pedal and Berko was dragged forward by the van and, as a consequence, he suffered injuries. *Id.* Berko brought suit against Harrigan. *Id.* The *Berko* court was faced with the issue of whether the fireman's rule prevented the police officer from recovering against Harrigan for his actions. The *Berko* case answered that question in the negative and explained:

> Of course, nothing in the "fireman's rule" prevents Officer Berko from suing the thief. This creates a paradox: since police fight crime, they must expect an occasional encounter with violence. Why then should they be permitted to sue a thief for personal injuries when they have assumed the risk that the thief might fight back? We resolve this paradox by observing that the public policy underlying the "fireman's rule" simply does not extend to intentional abuse directed specifically at a police officer. "To permit this would be to countenance unlimited violence directed at the policeman in the course of most routine duties. Certainly the policeman and his employer should have some private recourse for injuries so blatantly and criminally inflicted." *Krueger v. City of Anaheim, supra,* 130 Cal.App.3d [166,] 170, 181 Cal.Rptr. [631,] 634 [(4th Dist.1982)]. No fundamental un-

fairness results from allowing an officer to sue a criminal. The crook does not summon the police for help. While the police are paid to risk being assaulted, they are not paid to submit to a criminal assault. *Cf. State v. Mirault*, 92 N.J. 492, 499, 457 A.2d 455 ("We discern no legislative intention to discount assault upon police officers as though it were something to be expected, a part of the game, so to speak.").

*Id.* at 667–68.

*Prosser and Keeton on the Law of Torts* § 61, at 430 (5th ed.1984), is in accord with *Berko* ("The occupier [of land] is still required to refrain from injuring ... [public safety officers] intentionally or by willful and wanton misconduct."). Likewise, this Court and the Maryland Court of Appeals have strongly indicated, albeit in *dicta*, that the fireman's rule would not prevent a public safety officer from recovering from a defendant who intentionally causes harm. *See Flowers*, 308 Md. at 448–49, 520 A.2d 361; *Flood v. Attsgood Realty Co.*, 92 Md.App. 520, 526–27, 608 A.2d 1297 (1992).

The *Flowers* case did not involve the intentional injury to a public safety officer. Flowers, a firefighter, responded to an alarm at an apartment building; in the course of his duties, Flowers was on the twelfth floor of the building in a smoke-filled lobby when he fell down an open elevator shaft and sustained severe injuries. *Flowers*, 308 Md. at 436–37, 520 A.2d 361. In the course of the *Flowers* opinion, the Court recounted the history of the fireman's rule in Maryland and discussed the rationale for the rule. *Id.* at 439–43, 520 A.2d 361. The Court held that the rule was based upon the unique relationship between firefighters (and other public safety officers) and the public. Citing, *inter alia, Pottebaum v. Hinds*, 347 N.W.2d 642 (Iowa 1984), for the proposition that "since government entities employ and train firefighters and policemen, at least in part, to deal with those hazards that may result from the actions or inaction of an uncircumspect citizenry, it offends public policy to say that a citizen invites private liability merely because he happens to create a need for those public services." *Flowers*, 308 Md. at 446, 520 A.2d 361. The *Flowers* Court went on to say:

We reiterate, however, that firemen and policemen are not barred from recovery for all improper conduct. Negligent acts not protected by the fireman's rule may include failure to warn the firemen of pre-existing hidden dangers where there was knowledge of the danger and an opportunity to warn. They also may include acts which occur subsequent to the safety officer's arrival on the scene and which are outside of his anticipated occupational hazards. As indicated by this Court in *Aravanis [v. Eisenberg,* 237 Md. 242, 206 A.2d 148 *]* , the fireman's rule should not apply "when the fireman sustains injuries after the initial period of his anticipated occupational risk, or from perils not reasonably foreseeable as part of that risk," 237 Md. at 252, 206 A.2d 148. In these situations a fireman or policeman is owed a duty of due care. *Moreover, the fireman's rule does not apply to suits against arsonists or those engaging in similar misconduct.*

*Id.* at 448–49, 520 A.2d 361 (footnotes omitted) (emphasis added).

For the proposition that "the fireman's rule does not apply to suits against arsonists or those engaging in similar misconduct," the Court stated in a footnote:

9 *See, e.g., Grable v. Varela,* 115 Ariz. 222, 224, 564 P.2d 911 (1977) (recognized arsonist exception to fireman's rule); *Giorgi v. Pacific Gas and Electric Company,* 266 Cal.App.2d 355, 72 Cal.Rptr. 119, 123 (1968) ("We do not deal with the arsonist or with one who prankishly or maliciously turns in a false alarm"); *Pottebaum v. Hinds,* 347 N.W.2d 642 (Iowa 1984) (policeman may recover for intentional acts of misconduct); *Berko v. Freda,* 93 N.J. 81, 90, 459 A.2d 663 (1983) ("No fundamental unfairness results from allowing an officer to sue a criminal. The crook does not summon the police for help"); *Krauth v. Geller,* 31 N.J. 270, 157 A.2d 129 (1960) (suggests arsonists fall within an exception to the fireman's rule).

In the case at bar, although the declaration referred to prior fires of "suspicious" origin at the apartment building, there was no allegation that the fire giving rise to this lawsuit was intentionally started.

*Id.* at 449 n. 9, 520 A.2d 361.

Earlier, the *Flowers* Court said, again in *dicta,* that firefighters and police officers may recover for injuries when the

owner of the premises engages in willful or wanton misconduct or entrapment. *Id.* at 443, 520 A.2d 361; *see also Flood,* 92 Md.App. at 526–27, 608 A.2d 1297. Willful and wanton conduct is less reprehensible than intentional misconduct and "[t]he duty to refrain from wilful and wanton conduct [also] proscribes acts committed intentionally." *Flood,* 92 Md.App. at 528, 608 A.2d 1297. If, as indicated in *dicta,* the fireman's rule does not protect a property owner whose willful or wanton misconduct causes injury to a public safety employee and does not protect an arsonist whose actions cause harm, logic dictates that a motorist who intentionally causes harm to a policeman should not enjoy the protective cloak of the fireman's rule.

Aside from all the above, it is a basic tenet of the common law that persons who intentionally cause harm to others should be held responsible for their actions. Thus, a criminal should not be protected civilly from the consequences of his wrongdoing. Like the *Berko* Court, we can see no conceivable public policy reasons why persons who intentionally cause harm to public safety officers should be protected by the fireman's rule. We therefore hold that the trial judge did not err when he denied appellants' motions for judgment.

### D. *The Reduction of Corporal Hill's Judgment in an Amount Equal to the Monies He Received in Workers' Compensation Benefits*

Corporal Hill, in his cross appeal, contends that the trial judge should have reduced the jury award by $20,000, rather than by the full amount he received in workers' compensation benefits ($30,583.51).

Section 19–513(e) of the Insurance article, Maryland Annotated Code (1997), reads:

*Reduction due to workers' compensation benefits.*—Benefits payable under the coverages described in §§ 19–505 and 19–509 of this subtitle shall be reduced to the extent that the recipient has recovered benefits under the workers' compensation laws of a state or the federal government.

Section 19–509 describes the benefits payable under uninsured motorist coverage. Section 19–509, with a few narrow exceptions, requires all motorists in the state to have minimum U.M. limits of $20,000 per person and $40,000 per accident.[7] Under section 19–509, an insured can make a claim against his own insurer when he is involved in an accident caused through the fault of a motorist who either has no insurance or who has liability insurance but in an amount less than the insured's U.M. policy limits.

The trial judge read section 19–513(e) as requiring that Corporal Hill's judgment be reduced in the full amount of the workers' compensation benefits he received. Although the trial judge did not spell out his reasons for doing so, he apparently applied the plain language of section 19–513, inasmuch as all benefits due Corporal Hill from State Farm were benefits paid "under the coverage described in" section 19–509. Accordingly, the court reduced Corporal Hill's U.M. benefits "to the extent that the recipient [Corporal Hill] has recovered benefits under the workers' compensation laws" of the State.

In support of his argument that the jury award should have been reduced only in the amount of $20,000, Corporal Hill relies on language of the Insurance statute as it existed before it was changed in 1989. Prior to a 1989 amendment, the counterpart of 19–513(e) was found in article 48A, section 543(d), of the Maryland Annotated Code (1957), which read:

> Benefits payable under the *coverages required in* §§ 539 and 541 of this subtitle shall be reduced to the extent that the recipient has recovered benefits under workmen's compensation laws of any state or the federal government.

(Emphasis added.) Motorists were then required under section 539 to have personal injury protection (PIP) up to $2,500 and under section 541 to have uninsured motorist coverage of at least $20,000/$40,000. Due to the "coverages required in"

---

**7.** State owned vehicles, taxicabs, and buses are excepted from the requirement of having U.M. coverage.

language, one could make a plausible argument that because only $20,000 worth of uninsured motorist coverage was *required*, then workers' compensation benefits should be deducted up to the first $20,000, but, if the plaintiff had higher uninsured motorist limits and the workers' compensation benefits received exceeded $20,000, then only $20,000 should be deducted. Support for such an argument can be found in *Hoffman v. United Services Automobile Ass'n*, 309 Md. 167, 522 A.2d 1320 (1987).

Kenneth Hoffman ("Hoffman") and his wife were insured under a policy issued by United Services Automobile Association ("USAA"). *Id.* at 168, 522 A.2d 1320. The Hoffmans' policy covered two of their automobiles and provided uninsured motorist coverage in the amount of $300,000 for each person injured and $500,000 for each accident ($300,000/$500,000). *Id.* at 169, 522 A.2d 1320.

In Connecticut, the Hoffmans were passengers in a car driven by Richard Whelan, when Whelan's vehicle collided with a vehicle driven by Richard Nowakoski. *Id.* Hoffman's wife was killed in the accident, and Hoffman was seriously injured. *Id.* Hoffman, individually and as personal representative of his wife's estate, sued Nowakoski. *Id.* The estate received $20,000 from Nowakoski's insurer—the limits of his liability insurance policy. *Id.* Mrs. Hoffman's estate also received another $30,000 under the underinsured portion of Whelan's policy. *Id.* at 169–70, 522 A.2d 1320.

Hoffman, individually and on behalf of his wife's estate, then sued USAA in the United States District Court for the District of Connecticut to obtain benefits payable under the uninsured motorist portion of Hoffman's USAA policy. *Id.* At 170. USAA refused to pay, relying, in part, on Maryland Code (1957), article 48A, section 543(a), which provided:

Notwithstanding any other provision of this subtitle, no person shall recover benefits under the coverages *required in §§ 539 and 541* of this article from more than one motor

vehicle liability policy or insurer on either a duplicative or supplemental basis.

(Emphasis added.)

The Court of Appeals, answering a question posed under the Maryland Uniform Certification of Law Act (Maryland Code, 1974, 1984 Repl.Vol.) §§ 12–601 to 12–609 of the Courts and Judicial Proceedings article, rejected USAA's argument that section 543(a) prohibits recovery under USAA's underinsurance motorist endorsement because Hoffman had already recovered the statutory minimum from another insurer. *Id.* at 174–78, 522 A.2d 1320. In the course of its opinion, the Hoffman Court construed section 543(a) as applying only to coverage "required" under section 541 ($20,000/$40,000) and not to the optimal supplemental coverage, which was not required in section 541 but which the insured elected to obtain by paying additional premiums. *Id.* at 177–78, 522 A.2d 1320.

In 1989, the legislature modified the language in article 48A, section 539 (now section 19–505 of the Insurance article) by allowing the first named insured in every policy to waive PIP coverage for all named insureds, all listed drivers, and all members of the first named insured's family who reside in the household of the first named insured and who are sixteen years old or older. *See* S.B. 170 of the 1989 Session. The legislature, by virtue of the 1989 amendment, also changed the language of article 48A, section 543 (now section 19–513 of the Insurance article). Wherever the phrase "require in" was used, it was replaced with the phrase "described in." As amended, section 543 read: "Benefits payable under the coverage *described in* §§ 539 and 541 of this subtitle shall be reduced to the extent that the recipient has recovered benefits under workmen's compensation laws of any state or the federal government."

 " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999) (quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)). To determine legislative intent, we look first to the language of

the statute itself. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455 (1997). We give the language of section 19–513 "its natural and ordinary meaning, keeping in mind the aim and objective of the statute." *Jones v. State,* 357 Md. 141, 159, 742 A.2d 493 (1999).

Prior to 1989, the Court of Appeals said in the case of *State Farm Mutual Automobile Insurance Co. v. Insurance Commissioner of Maryland,* 283 Md. 663, 674–75, 392 A.2d 1114 (1978), that the clear purpose of article 48A, section 543(d) (now § 19–513(e) of the Insurance article), was to prohibit the duplication of benefits.

Corporal Hill contends that the legislature changed the "required in" language in section 543 simply because PIP coverage was no longer "required." Despite the changed language, he claims that the legislature nevertheless still intended to allow worker's compensation deductions under section 543(d) (now 19–513(e) of the Insurance article) only up to the limits *required by* section 541 (now section 19–509 of the Insurance article). Conspicuously absent from Hill's brief is any explanation as to why the legislature would want to allow duplication of benefits if an insured received more than $20,000 in worker's compensation benefits but disallow duplication of benefits (in cases like Trooper Poffenberger's) when an insured received less than $20,000 in benefits.

It is not clear from the legislative history of the 1989 amendment to section 543(d) why the legislature changed the words "required in" to "described in." It is at least possible that the legislature, based on the *Hoffman* case, wanted to clarify its intent that there should be no duplication of worker's compensation benefits no matter what the insured's U.M. limits might be. In any event, section 19–513(e), as it is presently written, is unambiguous. It says plainly that benefits payable under the coverage described in section 19–509 (i.e., U.M. benefits) shall be reduced to the extent that the recipient has recovered benefits under the worker's compensation laws of this state. The trial judge reduced Corporal Hill's

judgment in exact compliance with the dictates of section 19–513(e). To have done otherwise would have been to make law—not to follow it.

**JUDGMENT AFFIRMED; COSTS TO BE PAID THIRTY FIVE–PERCENT BY STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, FORTY FIVE PERCENT BY NATIONWIDE INSURANCE COMPANY, AND TWENTY PERCENT BY TERRENCE HILL.**